# Staunton.

## SCHMELZ BROTHERS, BANKERS, INC., *v.* QUINN AND OTHERS.

September 21, 1922.

˙Absent, Kelly, P.

1. MORTAGES AND DEEDS OF TRUST—*Representations to Mortgagor as to Collateral Held by Mortgagee to Pay the Mortgage Debt—Case at Bar.*—In the instant case a wife gave to a bank a deed of trust to secure the debt to the bank of a corporation of which her husband was an officer and principal stockholder. The wife was not a stockholder in the corporation. The wife had positively refused to sign the deed of trust and she and her husband testified that she continued to refuse until a representative of the bank told her that the corporation had good and solvent accounts which were first to be applied to the mortgage debt, amounting to upwards of $10,000. The testimony of the representative of the bank upon this point was unsatisfactory. The deed of trust prepared by counsel for the bank itself asserted the existence of certain collateral, aggregating the sum of $10,288.40, which was to be collected and applied towards the payment of the debt secured, which amounted to a representation by the bank of the existence of such collateral, and this representation was untrue.

    *Held:* That, upon this and other evidence, there was a positive representation to the mortgagor by the mortgagee that there were $10,000 of good accounts which were primarily liable for the payment of the debt secured, that the representation was untrue, and that the mortgagor was relieved from liability to the extent of the collateral.

2. FRAUD AND DECEIT—*Mistake and Accident—Party Making Representation Believing it to be True.*—If a party innocently misrepresents a material fact by mistake, the effect is the same on the other party who is misled by it as if he who innocently made the misrepresentation knew it to be positively false. The real question in such a case is not what the party making the representation knew or believed, but was the representation false, and the other party misled by it.

3. MORTGAGES AND DEEDS OF TRUST—*Accounts Assigned as Collateral Security for the Debt Secured by the Mortgage—Duty of Mortgagee to inform Mortgagor of the Doubtful Validity of such Accounts—Case at Bar.*—In

the instant case complainant, a wife, gave a deed of trust upon her realty to a bank to secure the debt of a corporation in which her husband was an officer and stockholder. The deed of trust provided that certain accounts amounting to something more than $10,000, assigned by the corporation to the bank as collateral, should be primarily liable for the mortgage debt. The corporation had previously assigned its accounts as collateral to secure other debts due from it to the bank, and the bank had found that a large amount of such collateral had been collected by the corporation, or for some other reason was invalid, and such irregularities were known to the representative of the corporation at the time the deed of trust was given.

*Held:* That the failure of the corporation or its representative to notify the maker of the deed of trust of the irregularities of the corporation in its previous dealings with the bank, or at least to notify her of the doubt and uncertainty as to the existence and validity of the collateral entitled her to relief, at least to the extent of placing her in the same position as if there had been $10,000 of good solvent collateral.

4.  Assignments—*Duty of Assignee to Notify Debtors of Assignment—Case at Bar.*—In the instant case a wife gave a bank a deed of trust to secure the debt of a corporation in which her husband was an officer and stockholder. The deed provided that certain accounts of the corporation should be assigned the bank as collateral primarily liable for the debt.

*Held:* That it was primarily the duty of the bank to promptly notify each of the debtors of the assignment to it of his account.

5.  Judicial Notice—*Women's Knowledge of Business Matters—Mortgages and Deeds of Trust—Assignment of Collateral as Primary Security for the Mortgage Debt—Notice to Debtors of Assignment—Estoppel of Mortgagor—Case at Bar.*—It is a fact of common knowledge to which a court cannot shut its eyes, that the average woman without any business training, or knowledge of business affairs, would not understand the legal effect of a conversation by which it was agreed by the parties to a mortgage to secure the debt of a corporation including herself, the mortgagor, that notice of the assignments of certain accounts by the corporation as collateral primarily liable for the mortgage debt should be given, not by the mortgagee to whom they were assigned, but by the corporation. If she heard such conversation about the giving of notice, and her failure to speak was from ignorance of her legal rights and duties in the premises, she would not be estopped from setting up the duty of the mortgagee to give notice of the assignments.

6.  Mortgages and Deeds of Trust—*Assignments of Accounts to Mortgagee as Primary Security for the Mortgage Debt—Duty of Mortgagee as to Collecting Accounts—Case at Bar.*—In the instant case complainant gave a mortage to a bank to secure the debt of a corporation in which her

husband was a stockholder and officer.   The mortgage provided that certain accounts of the corporation assigned to the bank as collateral should be primarily liable for the mortgage debt.

*Held:*   That failure of the bank to take any steps to collect the collateral, or to make any complaint to the corporation or the mortgagor about the nonpayment of the accounts to the bank, or to give notice to the other debtors of the assignment of their accounts to the bank, relieved the mortgagee to the extent of the collateral.

7.   Judgments and Decrees—*Declaratory Judgments—Case at Bar.*—In the instant case a deed of trust provided for a commission of five per cent. to the trustees.   The trial court undertook to administer the trust itself and appointed the trustees as commissioners to make a sale of the land and allowed them only the commission prescribed by the statute for judicial sales.   This was assigned as error.   The ruling was in favor of the appellant, and it had no just ground of complaint, but it was said that the question was one upon which the trial courts were not in harmony, and counsel on both sides asked a ruling of the Supreme Court of Appeals on the subject.

*Held:*   That such ruling was possibly warranted by the late act of Assembly on the subject of declaratory judgments.   Acts 1922, chapter 517, page 902.

8.   Mortgages and Deeds of Trust—*Trustees—Commissions where no Duties are Performed.*—Commissions provided by a deed of trust are intended to compensate the trustees for services to be rendered by them as such, and for the risks to be incurred in administering the trust.   If no services are rendered and no risks incurred by the trustees as trustees, they are not entitled to the compensation provided by the deed.

9.   Trusts and Trustees—*Trust Deed—Commissions of Trustee—Property Sold at a Judicial Sale—Whether a Sale was under a Trust Deed or was a Judicial Sale.*—A deed of trust provided for a commission of five per cent. to the trustees, in case of a sale under the deed.   In a suit to set aside the deed, the court undertook by its decree to administer the trust created by the deed, and directed the land to be sold by the trustees in the deed, "as commissioners of this court in this cause."   They were required to give bond and to "make report of their proceedings had hereunder to this court."   They made the sale, and subsequently, as "trustees and special commissioners," reported it to the court, and the court "ratified and confirmed" the sale.

*Held:*   That this was a judicial sale, and the trial court committed no error in fixing the compensation of the "trustees and commissioners" in accordance with section 6279 of the Code of 1919.

Appeal from a decree of the Law and Chancery Court of the city of Roanoke.   Decree for complainants. The named defendant appeals.
                                                        *Affirmed.*

The opinion states the case.

*J. Winston Read* and *Hart & Hart*, for the appellant.

*Jackson & Henson* and *H. M. Fox*, for the appellees.

BURKS, J., delivered the opinion of the court.

[1] For some time prior to October 31, 1916, the Virginia Metal Culvert Company, Inc., had been engaged in the manufacture and sale of metal culverts. Its sales seem to have been confined principally to the States of Virginia and West Virginia, and its customers to railroad companies, counties, cities and towns. It had secured a line of credit with the appellant, and on October 31, 1916, it was indebted to the appellant in the sum of $15,126. This indebtedness was evidenced by sundry notes of the culvert company, with collateral attached. When the culvert company desired money it executed its collateral note for the sum desired, payable to the appellant, and attached to it an invoice of goods sold or supposed to have been sold to one of its customers, and a carbon copy of a letter addressed to the purchaser notifying him that the account (invoice) had been assigned to the appellant and requesting that remittance therefor be made to the appellant. These papers were forwarded to the appellant and the note was discounted by it. A few days prior to October 31, 1916, the appellant sent E. S. Blanton, its cashier, to Roanoke where the culvert company was located and did business "for the purpose of ascertaining whether the accounts were *bona fide* and unpaid."

All of the stock of the culvert company appears to have been owned by two men in equal shares, to-wit: L. C. Stewart, who was president and a director of the company, and had charge of its financial affairs, and

Marshall A. Quinn, who was vice-president and a director, and who was "foreman of the shops." When Blanton went to Roanoke he employed counsel to represent the appellant. "He was under the impression that his claim or claims were in bad shape. He later went out to the plant of the concern, and upon returning to my office (his counsel's office) he seemed to be in much better humor." He found upon the books of the culvert company a considerable number of accounts which were good and which the company was willing to give him as collateral. Stewart, the financial man of the culvert company, was out of town when Blanton reached Roanoke and did not return until several days later. On the night of his return, which was Sunday, Blanton, Stewart and Quinn, together with one Flowers, a salesman of the culvert company, met at Blanton's room at the Hotel Roanoke to discuss the matter of the indebtedness of the company to the bank. Blanton and Flowers left the conference in order to permit Stewart and Quinn "to thresh the matter out between themselves," and, upon their return, "Blanton was informed that the matter would be taken up with their respective wives relating to some method of meeting the situation." Later that evening Flowers saw Mrs. Quinn and asked her "if she was going to do anything, and she said absolutely no." This information he communicated to Blanton.

Mrs. Quinn owned a valuable house and lot in the city of Roanoke, but owned no stock in the culvert company and had nothing to do with its business. The testimony as to who requested Mrs. Quinn to give a deed of trust on her property to secure the indebtedness of the culvert company is very conflicting. Quinn and wife testified that the deed was executed at the instance of Blanton, while Blanton says: "I think Mr. Quinn first went to his wife at the request of Mr. Stewart. I am very certain that I never made any

such request, either directly or indirectly." When asked on cross-examination if he had not come to Roanoke for the purpose of getting some kind of settlement of his debt, he replied, "No, I came for the purpose of ascertaining whether the accounts were *bona fide* and unpaid."

On the subject of Blanton's knowledge of the attitude of Mrs. Quinn towards the deed of trust and his connection therewith, Blanton testified as follows:

"Q. Then who suggested giving this security?

"A. I think Mr. Stewart first suggested it.

"Q. You knew he was trying to get the security?

"A. I knew that he was attempting to get security.

"Q. Yes?

"A. I did.

"Q. You knew that he was attempting to get Mrs. Quinn to join in that deed?

"A. I knew that he was attempting to get Mr. Quinn to join.

"Q. Didn't you know that the property was in Mrs. Quinn's name?

"A. I didn't know it, I was so told.

"Q. You knew they were trying to get Mr. and Mrs. Quinn to give a deed of trust on their home to secure this debt?

"A. I knew Mr. Stewart had stated that that was his intention.

"Q. You knew also, before this deed of trust was given, that Mrs. Quinn had at first refused to give any such deed of trust, did you not?

"A. Not directly—only by hearsay evidence. I didn't know that from Mr. Quinn.

"Q. Who did you hear it from?

"A. I think Mr. Flowers told me that.

"Q. It is a matter of fact that Mr. Flowers went to

Mrs. Quinn, at whose suggestion it makes no difference now, but he went to Mrs. Quinn and talked to her about giving this deed of trust, and she refused, did she not, or so Mr. Flowers reported?

"A. Mr. Flowers reported that Mrs. Quinn had refused to give the deed of trust.

"Q. And you know that afterwards Mrs. Quinn did give the deed of trust?

"A. I saw her sign it.    Of course.

"Q. And you knew that in between the time she refused and the time she gave it, you had gone over these books in the office of the Metal Culvert Company?

"A. I had gone over the books presented to me by Mr. Stewart.    I did not make an audit of the company in any sense of the word."

Quinn was "foreman of the shops," and had nothing to do with the finances of the company, except occasionally to sign checks for payrolls, and did not know of the status of the accounts of debtors, nor does it appear that he had any knowledge of irregularities in the assignment of accounts by the culvert company to the bank.    It is certain that Mrs. Quinn had none.

Quinn and his wife testified that after going over the books, Blanton stated that there was upwards of $10,000 of good accounts on the books.    Blanton denies having made the statement, but his testimony is not clear and satisfactory.    On this subject he testified, among other things, as follows:

"Q. Did you have any reason to doubt that those accounts were not good and valid accounts, as the ledger showed them?

"A. I did not.    ·

"Q. You have no reason to think that they were paid at that time, had you?

"A. I had not.

"Q. And you did believe that they were good solvent accounts?

"A. Of course I did.

"Q. You had a reason to tell Mrs. Quinn that they were not good accounts, did you?

"A. I think I did, because I was to some extent guaranteeing the accounts, and that was not my province to guarantee the accounts.

"Q. You say in your conversation you said to Mrs. Quinn that the people were solvent, or something of that kind; you mean if the accounts had not been collected the parties themselves were responsible people?

"A. To the best of my knowledge and belief, they were all responsible people.

"Q. Did you tell Mrs. Quinn that you were making that qualification?

"A. I don't remember making either statement, I said awhile ago if I made such a statement I think it must have been on that basis.

"Q. But what I am asking you is, if you did make such a statement, did you tell Mrs. Quinn it was on that basis?

"A. I probably did.

"Q. You won't swear to that, will you?

"A. No, I will not.

"Q. You say that Mr. Quinn had equal means of knowledge of these accounts that you had, in other words that he saw the ledger?

"A. He saw the ledger at the same time I did, or before I saw it.

"Q. And you both thought they were good accounts?

"A. I thought they were valid accounts undoubtedly."

Under these circumstances, counsel for the appellant,

at the instance of Blanton, prepared a deed of trust to
be executed by Stewart and wife and Quinn and wife
to John M. Hart and James P. Hart, trustees, securing
the payment of sundry notes of the culvert company
to the appellant, amounting to $15,126. This deed
bears date October 31, 1916, but there was some delay
in its execution, because the beneficiary and its counsel
"were waiting on Mrs. Quinn to sign." Mrs. Quinn
had positively refused to sign it, and, according to her
testimony, never agreed to sign until assured by Blan-
ton that there was at least $10,000 of good collateral
for the debt, and that the property of Mrs. Stewart
should be first subjected. It was estimated that Mrs.
Stewart's property would yield $5,000 for the trust
fund, and if this was correct and the $10,000 was
applied to the debt the liability on Mrs. Quinn's prop-
erty would be between $500 and $600. The deed con-
veyed, amongst other things, the house and lot of Mrs.
Quinn in which she resided, in the city of Roanoke, Vir-
ginia, for the purposes of the trust. The deed of trust
contains the following, amongst other provisions:

"It is understood that certain collateral of the Vir-
ginia Metal Culvert Company, Inc., aggregating the
sum of $10,288.40, has heretofore been placed with
Schmelz Bros., Bankers, to secure the payment of the
thirty-one (31) notes first mentioned * * * which
collateral shall be held and collected by Schmelz Bros.,
Bankers, primarily for its own benefit until its entire
debt is paid." It is understood and agreed that the
said Schmelz Bros., Bankers, Inc., shall, as far as possi-
ble, collect the collateral in their hands and that any
amount collected by them shall be applied to the pay-
ment of the debt secured before either of the real prop-
erties conveyed shall be subjected to the lien of this
deed of trust. * *

"It is further understood and agreed that in the event it becomes necessary to foreclose this deed of trust, that the property of Alice E. Stewart, subject to the mortgage, as aforesaid, shall be first subjected and that the property of Mary E. Quinn shall be subjected only in the event that the proceeds derived from this property, and the collateral, so far as available, are insufficient to pay off and liquidate the debt secured in full.     *     *     *

"In the event that default shall be made in the payment of the notes secured, the beneficiary, so far as possible, shall exhaust the collateral securities now in its hands, or hereafter placed in its hands under the terms of this deed, but it shall not be compelled to bring any suit or action upon any such collateral to collect the same."

We do not doubt that Blanton acted in good faith in the matter of getting the deed of trust, and that he honestly believed that the culvert company held, as shown by its books, good and solvent accounts amounting to upwards of $10,000.     There was no doubt as to the solvency of the debtors, if the debts ever actually existed and had not been paid.     The question is, what, if any, representation did Blanton make as to the collatera ? Blanton, of course, was anxious to have Mrs Quinn sign the deed of trust.     This she had positively refused to do. Quinn and wife testify that she continued to refuse until Blanton represented that there were good and solvent collaterals which were to be first applied, amounting to upwards of $10,000.     Blanton's testimony on the subject is far from satisfactory.     While at times denying that he represented the facts to be as stated by Quinn and wife, at others he makes such statements as these: "I probably expressed the opinion that they were collectible accounts, if valid."

"Q. What did you tell Mrs. Quinn that day?

"A. I presume that all the accounts were collectible, if valid.

"Q. That is the language you used?

"A. I don't know if that is the language I used or not."

Again,

"Q. Did you tell Mrs. Quinn that you were making that qualification?

"A. I don't remember making either statement. I said awhile ago if I made such statement it must have been on that basis.

"Q. But what I am asking you is, if you did make such a statement, did you tell Mrs. Quinn it was on that basis?

"A. I probably did.

"Q. You won't swear to that, will you?

"A. No, I will not."

In addition to this, the deed of trust itself, which was prepared by counsel for the appellant, asserts in one of the paragraphs hereinbefore quoted the existence of "certain collateral of the Virginia Metal Culvert Company, Inc., aggregating the sum of $10,288.40," which is to be collected and applied towards the payment of the debt secured. This was, of itself, a representation by the appellant of the existence of such collateral, which representation was untrue. At that time $2,000 of this collateral had been paid, and upwards of $5,000 of it was bogus, or had no existence. Upon this and other evidence in the cause, the trial court held that there was a positive representation to Mrs. Quinn by appellant that there were $10,000 of good accounts which were primarily liable for the payment of the debt secured, and that representation was untrue. In this conclusion we concur.

[2] As said in *Guarantee Co.* v. *National Bank,* 95 Va.

480, 491, 28 S. E. 909, 913, "If a party innocently misrepresents a material fact by mistake, the effect is the same on the other party who is misled by it as if he who innocently made the misrepresentation knew it to be positively false.    The real question in such a case is not what the party making the representation knew or believed, but was the representation false, and the other party misled by it.    *Lynchburg Fire Ins. Co.* v. *West,* 76 Va. 575; *Grim* v. *Byrd,* 32 Gratt. (73 Va.) 293; *Max Meadows L. & I. Co.* v. *Brady,* 92 Va. 77, 22 S. E. 845; and *Wilson* v. *Carpenter,* 91 Va. 183, 21 S. E. 243."

[3] Furthermore, Blanton admitted that the alleged debtors were solvent, and that there was no reason why the debts could not be made, "if valid."    He reiterates in his testimony the statement that the debts were good, "if valid," and that he could only take the word of Stewart and Quinn for the validity of the debts, but does not state why he always added the qualification, "if valid." This, however, is explained by the witness Flowers, introduced on behalf of the appellant.    Flowers was asked, "What do you mean by saying that he could only take their word for it that they were good?"    To which he replied, "His position was that he had with him at the time $15,000 worth of accounts that were presumed and proven not to be good and the consequence was, as I understood, that the presumption was that the other $10,000 that were claimed to be good might be in the same condition."    How long the culvert company had been borrowing from the appellant does not appear, but it does appear that during these dealings it had assigned to appellant a large amount of accounts that were not valid.    The invalidity was not on account of the insolvency of the debtors, but for other reasons.    Hence, the purpose of the visit of Blanton to Roanoke was not to enquire into the solvency of the debtors to the culvert

company, about which no question was raised, but to ascertain "whether the accounts were *bona fide* and unpaid." When he first went to Roanoke, and before he had gotten any additional security for the claims of the appellant, "he was under the impression that his claim or claims were in bad shape." He knew that his principal then held a large amount of collateral of the culvert company, which the latter had collected, or which for some reason was invalid, and that the culvert company had not dealt squarely with the appellant. None of these matters was disclosed to Mrs. Quinn before the deed of October 31, 1916, was executed and delivered, whereby her property was made liable for the debts of the culvert company. Notwithstanding Blanton's denial that he ever, directly or indirectly, requested Mrs. Quinn to execute the deed of trust, and that he "was very careful not to make any such suggestion," the fact remains that the deed of trust was prepared by counsel for the appellant, was tendered to Mrs. Quinn for her signature, and was signed and acknowledged by her in the office of said counsel, without any disclosure to her of the prior misconduct of the culvert company in the matter of the assignment to the appellant of the invalid accounts. Mrs. Quinn had no knowledge of this misconduct or that there was any question as to the validity of the collateral to be assigned. Her property was being taken as security for the debt of the culvert company for which she was in no way bound, and the failure of the appellant to disclose the facts above mentioned was a fraud upon her rights. *Guarantee Co.* v. *National Bank*, 95 Va. 480, 28 S. E. 909, was an action upon the bond of Hamner, teller of the bank, to recover for his defalcation. The guarantee company, which was surety on Hamner's bond, filed a special plea in which it was alleged "that the guarantee company was induced to

execute as surety the bond of Hamner as teller of the bank by the positive representation in writing made to it for and on behalf of the bank by its cashier, that Hamner was never in arrears or default to the bank; that his books and accounts, including cash, securities and vouchers, were last examined in December, 1893, by a committee of the board of directors of the bank and found to be correct; and that but for this representation it would not have executed the bond.    It then avers that these representations were false; that Hamner was at the time of these representations, and had been long prior thereto, a defaulter and largely in arrears to the bank; and that the examination of his books and accounts, including cash, securities and vouchers, which was reputed to have been made in December, 1893, was not so made; and that if it had been made his defalcation would have been discovered.

This plea was held to be good.    The plea alleged that the examination of the books and accounts of Hamner which was represented to have been made in December, 1893, was not so made.    The same result would have followed if the allegation had been that the examination was so carelessly and negligently made as to fail to disclose the defalcation which in fact existed and was disclosed by said books and accounts.    See also Childs on Suretyship and Guaranty, sec. 54.

In *Hudson* v. *Miles*, 185 Mass. 582, 585, 71 N. E. 63, 65, 102 Am. St. Rep. 373, it is said: "It may be taken to be settled that if it is known to the obligee of a bond that the principal in the past has been guilty of irregularities in respect to the duties for the faithful performance of which in the future the bond is given, the failure of such an obligee to disclose that fact is a defense to the liability of such a surety: *Phillips* v. *Foxall*, L. R. 7 Q. B. 666; *Sooy* v. *State*, 39 N. J. L. 135.    The ground

of this defense in some cases has been stated to be that fraud is made out (*Lee* v. *Jones*, 17 Com. B. N. S. 482, 507), and in other cases that there is a concealment of facts which the surety has a right to know: *Railton* v. *Mathews*, 10 Clark & F. 934, 943."

The principle announced in these cases, when applied to the facts of the case in judgment, required the appellant to notify Mrs. Quinn of the irregularities of the culvert company in appellant's previous dealings with that company, or at least to notify her of the doubt and uncertainty as to the existence and validity of the collateral referred to in the deed as first liable for the payment of the debt secured. To the extent of the value of the property conveyed, she stood in the relation of surety for the culvert company, and was entitled to this information, and the failure to give it entitled her to relief, at least to the extent of placing her in the same position as if there had been $10,000 of good solvent collateral transferred by the deed.

[4, 5] We are further of the opinion that the appellant was negligent in failing to look after the collection of the collateral deposited with it by the culvert company. It was primarily its duty to promptly notify each of the debtors of the assignment to it of his account. The appellant admits this, but seeks to excuse itself on the ground that immediately after the deed was executed, and while the grantors were still present at the place of execution, it was agreed by all the parties, including Mrs. Quinn, that the notices should be sent out from the office of the culvert company by Stewart and Quinn, or one of them. There were present at that time, the grantors in the deed, to-wit: Stewart and his wife and Quinn and his wife, and also Blanton, the agent of the appellant, and John M. Hart, his counsel. Stewart, Blanton and Hart all testify to the agreement as to

the notice.    Quinn's testimony on the subject is unsatisfactory, but in it he makes admissions that tend to show that he also assented to the arrangement.    Mrs. Quinn denied being present when any such arrangement was made, or assenting to the arrangement, and Mrs. Stewart testified that she "did not pay any attention to the conversation," and hence did not recollect what transpired about the notice.    Hart testified that the conversation about the notice took place "just as they were going out of the room" after the deed was executed, but that all of the parties were still present, within a few feet of each other, and that there could be no doubt about the fact that all of them heard the conversation and agreement.    It is manifest, however, even conceding that Mrs. Quinn was still present, that neither she nor Mrs. Stewart had any idea that they were agreeing to anything that affected their rights or liabilities.    Mrs. Quinn denies ever agreeing that Stewart or Quinn should give the notices, or ever acquiescing in such an agreement, and had no recollection of any statement made about giving the notices.    The conversation on the subject of the notices made so little impression on Mrs. Stewart that she paid no attention to it.    It may be well doubted if they would have understood the effect of the agreement between the parties who were talking, if they had heard it, and Mr. Hart, counsel for the appellant, states on cross-examination that he did not explain it to them.    It is a fact of such common knowledge that we cannot shut our eyes to it, that the average woman without any business training, or knowledge of business affairs, would not understand the legal effect of such a conversation as here detailed, and that a great majority of our women are of that class.    As a rule, they know little of business affairs and the manner in which they are conducted.    If Mrs.

Quinn heard the conversation about giving notice, and her failure to speak was from ignorance of her legal rights and duties in the premises, she would not be estopped from setting up the duty of the appellant to give notice of the assignments. *Davis* v. *Owen*, 107 Va. 283, 58 S. E. 581, 13 L. R. A. (N. S.) 728; *Mullins* v. *Shrewsbury*, 60 W. Va. 694, 55 S. E. 736. The trial court saw the witnesses and heard them testify, and gave credit to Mrs. Quinn, and we are unable to say that it committed any error in this respect.

[6] In addition to this, the record fails to disclose that the appellant took any steps whatever to collect the collateral, or made any enquiries about it, or any complaint or any report to the culvert company, or Stewart, or Quinn, or their wives, on the subject. As a matter of fact $2,000 of it had been collected before the assignment and $5,346 of it was paid to the culvert company after the assignment. The record does not disclose when the various items of the collateral fell due, but the dates of the payments to the culvert company would indicate that they began falling due within three weeks after the assignment. The appellant knew that it was not getting the money, and that if the collateral was paid, it must have been to the culvert company, and yet made no demand on the culvert company for it, entered no protest against its collections and gave no notice to other debtors of its assignment, but so far as disclosed by the record sat still and did nothing. This was greatly to the detriment of Mrs. Quinn, the complainant in the court below.

The record does not clearly and distinctly show the dealings of the parties, but the stipulation of counsel printed in the record takes a single item of the collaterals that were assigned as typical, and shows how it was dealt with. The Chesapeake and Ohio Railway

Company was indebted to the culvert company in the sum of $1,147 for an invoice dated July 27, 1916. On August 10, 1916, the culvert company executed to the appellant its collateral note for $918, payable on demand, and attached the invoice as collateral, and also a carbon copy of a letter to the purchasing agent of the railway company, dated August 9, 1916, as follows, to-wit:

"Dear Sir:

"Referring to our invoice of July 27th, amounting to $1,147.50, beg to advise that we have assigned this account to Schmelz Brothers, Bankers, Inc., Newport News, Virginia, and will request that in remitting for the amount you kindly forward check to them.

"Very truly yours,<br>"Virginia Metal Culvert Co., Inc."

The stipulation of counsel states that a similar letter was filed with each note and invoice, bearing the same date as the note to which the collateral was attached.

It will be observed that the date of the maturity of the invoice is not given, but it appears from the testimony that this item of $1,147 was paid to the culvert company November 18, 1916. There runs through the record an intimation, which apparently is not controverted by the appellee, that the notices of assignment of which carbon copies were furnished the appellant, were never given to the debtors in the invoices, but we have been unable to find any testimony in the record in support of the intimation. On the contrary, Stewart, the president of the culvert company, testified as follows:

"Q. Were the letters, a copy of which is filed with each exhibit, written to the parties addressed?

"A. I would assume so; as the copy seems to be here, although I did not do it personally."

If such letters were in fact received by the parties, that was sufficient to bind them and no further notice of the assignment was necessary. But however this may be, the negligence of the appellant in regard to the collection of the collateral, as pointed out above, was such as to relieve Mrs. Quinn from any liability for the $10,000 of collateral represented to be good.

[7-9] The deed of trust in controversy provides for a commission of five *per cent.* to the trustee, in case of a sale under the deed. The trial court allowed only the commission prescribed by the statute for judicial sales. Code, section 6279. This is assigned as error. The ruling is in favor of the appellant and it has no just ground of complaint, but it is said to be a question upon which the trial courts are not in harmony, and counsel on both sides have asked the ruling of this court on the subject. Such ruling is possibly warranted by the late act of Assembly on the subject of declaratory judgments. Acts 1922, chapter 517, page 902. The commission provided by the deed was intended to compensate the trustees for services to be rendered by them as such and for the risk to be incurred in administering the trust. If no services were rendered and no risk were incurred by them as trustees, they were not entitled to the compensation provided by the deed. The court undertook by its decree to administer the trust created by the deed. It directed the land of Mrs. Stewart, one of the grantors in the deed, to be sold, and that the sale should be made by John M. Hart and James P. Hart, trustees in the deed, "and as commissioners of this court in this cause." They were required to give bond and to "make report of their proceedings had hereunder to this court." They made the sale, and subsequently, as

"trustees and special commissioners" reported it to the court, and the court "ratified and confirmed" the sale. This was a judicial sale and the trial court committed no error in fixing the compensation of the "trustees and commissioners" in accordance with section 6279 of the Code.   The proceedings adopted relieved them of the duties and responsibilities of trustees, which was the foundation for the compensation provided by the deed of trust.

We find no error in the decree of the court of law and chancery, and it is accordingly affirmed.

*Affirmed.*