# Richmond

## J. MERRITT CHANDLER V. PAULINE SATCHELL.

April 7, 1933.

Present, All the Justices.

The opinion states the case.

*Stewart K. Powell* and *James E. Heath,* for the plaintiff in error.

*Mapp & Mapp* and *Herbert Barnes,* for the defendant in error.

Browning, J., delivered the opinion of the court.

In the trial court Pauline Satchell was plaintiff and J. Merritt Chandler and The Accomac Banking Company, Incorporated, were defendants.

The action was that of trespass on the case in which the plaintiff claimed the loss of $1,500, the sum which she paid for certain bonds which she was induced to purchase by the representations of the defendants, and which turned out to be worthless.

At the conclusion of the plaintiff's evidence the court struck out the whole of it so far as it referred to the banking company, and a verdict in its favor was rendered by the jury. The trial proceeded against J. Merritt Chandler and resulted in a verdict against him for the sum of $1,500, with interest from September 15, 1929. The verdict was sustained by the trial court.

The defendant brings error based upon the refusal of the court to set aside the verdict as being contrary to the law and the evidence and the rulings of the court in admitting certain evidence over the objection of the defendant and in granting and refusing certain instructions. Pleas of the statute of limitations were filed by the defendant which were rejected by the court, but as they were not relied upon to the extent of argument as to their applicability they will not again be referred to.

Where the evidence is conflicting the verdict of the jury settles such conflict in favor of the version of the party prevailing. The facts stated in this light are as follows:

The defendant was, and long had been, the cashier of the Accomac Banking Company, Incorporated, a State bank located and doing business at Parksley, Accomac county, Virginia. The plaintiff had for a number of years been a customer and depositor of the bank. Her savings from her earnings as a bookkeeper and saleslady were deposited from time to time in the bank on savings account until they

grew to the proportions of $1,500. In September of 1927, while making a deposit, she realized the extent of her accumulations, and asked the defendant if he knew of some safe place where he could place her money so that she could advantage by a larger rate of interest. He said he thought he could handle it so as to accomplish the end she had in view, and suggested that he could loan it on some adjacent land, and that it would be nice when she was driving out on Sunday afternoons to feel that she had her money loaned on certain local lands. She said that was her idea. It was in evidence that the plaintiff was without business experience, except such as she had acquired as a bookkeeper and saleswoman, which did not include such financial transactions as are the subject of this controversy.

Some two weeks after this conversation the defendant chanced to be passing along the street in Parksley while the plaintiff was sitting in her automobile and he stopped and asked her to come down to the bank as he thought he could arrange that business for her. Pursuant to this she went to the bank on the following day, which was September 30, 1927, and the defendant produced three bonds for $500 each, and said: "These bonds are hard to get, I could use many more of them than I get." She asked him if they were government bonds, to which he replied: "No, Miss Pauline, but these are good as gold, these are bankable bonds. The beauty about that is any time you want your principal all you have to do is to come to this bank and ask for it and the day your interest is due it is paid." The defendant then drew a check for the amount of the bonds with several days earned interest added, which was payable to himself, and which was signed by the plaintiff. He also stated with reference to the bonds that he always recommended them (like bonds) to his lady customers because he thought they were "better than loaning it on farm lands." He further said: "Often you have to chase around to get your interest and if you want your principal unexpectedly you can't get it, maybe sometimes." He said that a Mrs.

Phillips, of that locality, had some of the same bonds and was much pleased with them.

At the suggestion of the defendant the plaintiff left the bonds at the bank to be placed in a safe deposit box to which she was given a key.

The three bonds purchased by the plaintiff were executed by the Larchmont Investment Corporation, dated August 15, 1927, and were part of an issue of $110,000.00, payable August 15, 1929. This bond issue was secured by a deed of trust of even date on 119 lots of the Larchmont Investment Corporation, constituting an undeveloped and outlying subdivision of the city of Norfolk.

The bonds were endorsed by T. M. Bellamy and J. W. Hough, who were realtors in the city of Norfolk, doing business under the firm name of Bellamy and Hough. They were the officials of the investment corporation and practically owned it. A portion of the land of the subdivision constituting the security had a water frontage which necessitated bulkheads which had to be filled in, and the contiguous lots and many others were unsuitable for building purposes unless made so by piling. Other lots were of land which was boggy, upon which was standing salt water and growing cat-tails. Many of them were of irregular shape. Thirty-five of them were high or on a straight grade and two of them were considered readily salable. There were no modern city improvements, but it appeared that such improvements were readily attainable by installation from nearby and convenient facilities, such as street connections, electric lines, etc. This topographical mention is made because it has to do with the question of the adequacy of the security presently to be further considered.

Foreclosure under the deed of trust was had by public sale on the 15th day of July, 1930, of ninety-four of the lots, which brought the sum of $500. J. Harry Rew and G. Walter Mapp were the purchasers. It will here be noted that J. Harry Rew was an attorney at law, and he and the defendant, J. M. Chandler, had negotiated the sale of a

previous bond issue, of which the bond issue of August 15, 1927, was a substitution or renewal, which transaction they also effected. G. Walter Mapp was of counsel for the plaintiff in the suit in judgment. The remaining twenty-five lots of the 119 covered by the deed of trust were not sold because of defective titles, and it is now noted that twenty-four of the lots sold were subject to the lien of prior deeds of trust and all of the lots sold were subject to the lien of delinquent taxes for the years from 1924 to 1929.

The interest coupons attached to the plaintiff's bonds were collected by the Accomac Banking Company, or the defendant Chandler, and placed to her credit in the bank until August 15, 1929, when there was default in the payment of the interest. The plaintiff, in the meanwhile, had saved an additional $500, and she went to the bank and asked Chandler if he thought he could invest that, and he said that he thought he could. She was subsequently told by an assistant cashier that Mr. Chandler was going to Norfolk in a few days and he would get her a bond for all of her money. This was the first time the plaintiff had ever heard of Norfolk in connection with her bonds. Subsequently, the plaintiff heard that Mrs. Phillips, who has been referred to as having some similar bonds, was worried about the safety of her investment. The plaintiff, not having received the interest due August 15, returned to the bank and, in effect, asked the defendant to put all of her money back to her credit and note it on her bank book, stating that she was worried about the matter. He said he would rather not do that, that everything was all right and safe, and that there was no need to be worried because he would take just as good care of her as he would of his mother. This occurred after August 15, 1929. The next and last time the plaintiff saw defendant with reference to the matter she asked him what he intended doing about the bonds and he said: "The land is still there. These bonds are still safe. If you will just give me time, everything will come out all right."

The plaintiff's testimony was to the effect that she knew nothing about the bonds except what the defendant had told her; that she had never heard of the Larchmont Investment Corporation; that she knew nothing whatever of the security or the maker or endorsers or that there was a maker; that she relied implicity upon what Mr. Chandler told her; that she made no inquiries of any sort or investigation of any character touching any of these things.

Her testimony in chief, and upon cross-examination, was in part as follows:

### IN CHIEF.

"Q.  What did you rely upon in buying the three bonds that you bought, Miss Satchell?

"A.  The things that Mr. Chandler told me.

\*          \*          \*          \*          \*          \*          \*

"Q.  But for what he told you, would you or would you not have bought the bonds?

"A.  No, sir.

\*          \*          \*          \*          \*          \*          \*

"Q.  But for the representations made by Mr. Chandler, would you have bought these bonds?

"A.  No, sir.

"Q.  Did you rely on those representations?

"A.  I relied on all Mr. Chandler told me."

### CROSS-EXAMINATION.

"Q.  Let me see.  The only person that you saw in this transaction was the bank?  Is that right?

"A.  No, sir.  I saw Mr. Chandler.

"Q.  You saw the bank and Mr. Chandler?

"A.  That is right.

"Q.  You relied upon the bank's promise through Mr. Chandler to give you your money at any time.  Is that correct?

"A.   I relied upon all Mr. Chandler told me and with the bank combined.

\*          \*          \*          \*          \*          \*          \*

"Q.   I see, Mr. Chandler and the bank.   But you say in your declaration in this case that you never asked where they were secured or cared where they were secured, did you?

"A.   Simply because I trusted what Mr. Chandler told me."

The interest due the plaintiff on August 15, 1929, was never paid nor was any portion of the bonds, hence the suit in judgment.   T. M. Bellamy and J. W. Hough, who, it will be remembered, were the endorsers of the bonds and who were back of the maker, the Larchmont Investment Corporation, became involved in financial straits.   Their endorsements became worthless.   The evidence is conflicting as to when this condition came into existence.   The verdict of the jury resolves the time in favor of the evidence for the plaintiff, which was to the effect that the firm of Bellamy and Hough ceased to function as a going business concern, so far as the running of its office was concerned, in the first part of the year 1927.   This was testified to by William T. Sellers, who was a public accountant at Norfolk, Virginia, and who at one time had charge of the business of the firm.   He said that in 1927 the endorsement of T. M. Bellamy and J. W. Hough did not add one cent to the value of the plaintiff's bonds.

The contention of the plaintiff is that she entrusted the safety of the investment of her money entirely to the defendant, and placed the utmost faith in his representations to her about the matter.   That these representations induced her to buy the bonds and thereby to forego the original intention of the defendant to lend her money so that it would be secured on local lands which had strongly appealed to her; that the defendant knew or should have known that, on August 15, 1927, when the entire bond

issue was renewed, and on September 30, 1927, when the three bonds were purchased by her, his representations as to their safety and desirability as an investment were false; that he was charged with notice of the infirmity of these bonds—

First: Because the maker and endorsers were on their last financial legs, as it were, when the transaction took place, and that the business relations of the defendant with them were such that it was his duty to have made some investigation of the financial status of the securities referred to before advising depositors of the bank, of which he was an important official, to invest their money in them.

Second: Because the value of the land constituting the security was wholly inadequate even if the title had not been defective, and this was a matter of ready ascertainment. The weight of the evidence was that the value of the land in 1927 was $28,850.00.

Third: Because the title to such land was defective to a material degree and that it was gross negligence on the part of the defendant to sponsor a bond issue of the magnitude of this one and advise the depositors of the bank, particularly the plaintiff, to purchase the bonds secured thereby.

Fourth: That at the time of the sale of the bonds to the plaintiff the defendant was in possession of checks for a past due installment of interest on bonds of the preceding issue to this one, which checks were drawn by Bellamy and Hough on the Larchmont Investment Corporation, and which were not paid until months thereafter.

As to this last statement, the positive evidence sought to be introduced to prove it was rejected by the court as inadmissible, and no exception to this ruling was taken by the plaintiff. Counsel for the plaintiff base their argument on this point on the rejected testimony which we think is without legal authority; however, the testimony of the defendant strongly tends to prove that the payments of the interest checks were greatly in arrears.

The evidence, considered in its entirety, warranted the jury in its conclusion that some of the material representations made by the defendant and relied upon and acted upon by the plaintiff were not facts, though stated so to be. The bonds were not "as good as gold," nor were they what the defendant denominated "bankable" in the sense understood by the plaintiff that they would be taken back by the defendant's bank and the equivalent in money paid to her at such time as she might desire it.

In *Grim* v. *Byrd,* 32 Gratt. (73 Va.) 300, Judge Staples, speaking for this court, said: "Whatever conflict of opinion may have existed in the English writers on this subject, the doctrine is believed to be well settled in the United States, that a false representation of a material fact, constituting an inducement to the contract, on which the purchaser had the right to rely, is a ground for a rescission by a court of equity, although the party making the representation was ignorant as to whether it was true or false; and the real inquiry is not whether the vendor knew the representation to be false, but whether the purchaser believed it to be true, and was misled by it in entering into the contract. For in such case, whether the false representation was innocently made or knowingly made, the effect is the same upon the purchaser."

Also at page 301 of 32 Gratt. (73 Va.), Judge Staples continues: "But even matters of opinion may amount to affirmation, and be the inducement to a contract, especially where the parties are not dealing on equal terms and one of them has, or is presumed to have, means of information not equally open to the other."

In the case of *Schmelz Bros., Bankers* v. *Quinn,* 134 Va. 78, 113 S. E. 845, the court (syllabus) held: "If a party innocently misrepresents a material fact by mistake, the effect is the same on the other party who is misled by it as if he who innocently made the misrepresentation knew it to be positively false. The real question in such a case is not what the party making the representation knew

or believed, but was the representation false, and the other party misled by it."

The following instructions were given by the court as expressive of the law of the case:.

"1. The court instructs the jury that if one represents as true what is really false, in such a way as to induce a reasonable man to believe it, and the representation is meant to be acted on, and he to whom the representation is made, believing it to be true, acts on it and in consequence thereof sustains damage, there is such fraud as will support an action for deceit at law, or a bill for rescission of the transaction in equity. Whether the representation is made innocently or knowingly, if acted on, the effect is the same. In the one case the fraud is constructive; in the other it is actual.

"2A. The court instructs the jury that if you believe from the evidence that the defendant, J. Merritt Chandler, represented to the plaintiff, Miss Pauline Satchell, that the bonds of the Larchmont Investment Corporation, which he purchased for and sold to her, were as good as gold, were bankable bonds, and that any time she wanted the principal of said bonds all she had to do was to go to the Accomac Banking Company and ask for it, and that on the day her interest was due it would be paid; that these representations operated as an inducement to Miss Satchell to purchase said bonds, and that she was justified under the circumstances in relying upon said representations; but that, as a matter of fact, the said bonds were not worth what she paid for them; then whether the said representations were made innocently or knowingly, it amounted to a fraud on the plaintiff, and said plaintiff is entitled to recover in this action such damages as she has sustained thereby.

"A. The court instructs the jury that the burden is on the plaintiff to prove by a clear preponderance of the evidence that Mr. Chandler used this language to the plaintiff: 'These bonds are hard to get. I could use many more

of them than I get. They are as good as gold and are bankable bonds. Any time you want your principal, all you have to do is to come to this bank and ask for it, and the day your interest is due, it is paid.' Unless you believe that the clear preponderance of the evidence shows she is right as to what he said, and that he is wrong you should resolve such doubt in his favor and find for him.

■ "B. The court instructs the jury: That if they believe from the evidence that Mr. Chandler, without any compensation, but purely as an act of friendship and *accommodation*, and at the request of the plaintiff, secured the bonds involved in this action for the plaintiff from a third party, and that, if he used the following language: 'These bonds are hard to get. I could use many more of them than I get. They are as good as gold, and are bankable bonds. Any time you want your principal, all you have to do is to come to this bank and ask for it, and the day your interest is due, it is paid'—he was acting in good faith and merely expressing his honest opinion, without intending to make such statement as a fact, they will find for the defendant.

■■ "C. The court instructs the jury that fraud is never presumed, but that, on the contrary, people are presumed to act in good faith towards one another. The burden is always on one who charges fraud to establish it to the satisfaction of the jury by clear and preponderating evidence. And the court further instructs the jury that actual fraud means that the party charged with it was inspired by a deliberate fraudulent purpose to injure and deceive the plaintiff."

The following instructions were requested and refused by the court:

"(1) The court instructs the jury that the burden is on the plaintiff to prove by a clear preponderance of the evidence that Mr. Chandler used the words 'good as gold.' Unless you believe that the clear preponderance of the evidence shows she is right as to what he said, and that he is

wrong you should resolve such doubt in his favor and find for him.

"(2)   The court instructs the jury that an agent who acts without compensation is liable merely for gross negligence.   Notwithstanding therefore you should believe from the evidence that Mr. Chandler may not have exercised ordinary care in advising the plaintiff to purchase these bonds, yet, if you should believe from the evidence that he received no compensation from the plaintiff for his services, such lack of care on his part would not justify you in finding a verdict against him.   You must go beyond this and believe from the evidence that he was guilty of gross negligence.

"(3)   The court instructs the jury that fraud is never presumed, but that, on the contrary, people are presumed to act in good faith towards one another.   The burden is always on one who charges fraud to establish it to the satisfaction of the jury by clear and preponderating evidence. The burden is therefore on the plaintiff in this case to establish to your satisfaction by clear and preponderating evidence that the defendant, Chandler, if the plaintiff should contend that he was guilty of actual fraud, was actuated by a fraudulent purpose to deceive and injure her; that he meant his recommendation of the bonds to be a statement of fact and not of opinion; that he knew or ought to have known that what he said was false; that the plaintiff was induced to buy the bonds by this statement (and not by the promise which she alleges that Chandler made to her that the bank would redeem the bonds at any time) that the said statement was in fact false; and that the plaintiff has been damaged by it.   (If you believe from the evidence that the inducement to the plaintiff to buy these bonds was Chandler's alleged promise that the bank would redeem them, both principal and interest, at any time, you must find for the defendant.)

"4.   The court instructs the jury that, although they may believe that Chandler did tell Miss Satchell that he

would treat her as he would treat his mother, this was long after the bonds were acquired by Miss Satchell, and you have no right to give a recovery on account of it." (This instruction was requested after argument had closed.)

We think the instructions given by the court fairly presented the law of the case to the jury.

As to the instructions requested and refused, we find no error in the court's rulings as to instructions Nos. 1, 2 and 3, in view of the instructions which were given, which correctly set forth the law as applicable to the facts in the case. With respect to instruction No. 4, it appeared that counsel for the plaintiff, in argument before the jury, employed the testimony, which was the subject of the instruction, being a statement made by the defendant two years after the purchase of the bonds, and stressed or emphasized it, it is fair to assume, as a basis of recovery. It was then that the instruction was asked for. We think it is patent that the instruction should have been given, and its refusal, under the circumstances of this case, constitutes reversible error. It is easy to see that the jury might have been misled by the argument.

Again, the defendant sought by evidence to show the true value of the land which constituted the security for the bonds, at the time of the sale, inasmuch as it was a forced sale, and the land was bought in by purchasers one of whom had been connected with the negotiation of the bond issue and who was at some time an attorney for the Accomac Banking Company and the defendant, and the other was of counsel for the plaintiff. The contention of the defendant was that the purchase price of $500 did not reflect its true and fair value. The court ruled that this evidence was inadmissible, which we think was error.

Another assignment of error was the admission of the testimony of witnesses to the effect that the president of the bank had made to certain persons who were purchasers of similar bonds declarations which were, in effect, admissions highly favorable to the contentions of the plain-

tiff and of course inimical to the claims of the defendant. At the time this evidence was admitted the banking company was a defendant and then the testimony was legal and proper against the bank. Subsequently the court directed the jury to find a verdict for the company as there was no evidence upon which a recovery against it could be based. The defendant failed to move the court for the exclusion of this evidence as being inadmissible in the case of the remaining defendant, Chandler, he not being present when the declarations were made, and the statements of a bank official not being binding upon him, and the admission of the statements offending the rule against hearsay testimony. Upon a retrial of the case this testimony will, of course, not be admitted.

The other assignments of error, we think, are without merit.

It follows that for the reasons stated the judgment of the court will be reversed and the case remanded for a new trial to be had not in conflict with this opinion.

*Reversed and remanded.*