**GENERAL MOTORS ACCEPTANCE CORPORATION, Plaintiff-Appellee,**

v.

**CENTRAL NATIONAL BANK OF MATTOON, Defendant-Appellant.**

No. 84–1928.

United States Court of Appeals, Seventh Circuit.

Argued April 8, 1985.

Decided Sept. 5, 1985.

Theodore M. Becker, Becker & Tenenbaum, Chicago, Ill., for plaintiff-appellee.

Kenneth L. Bast, Kidwell, Cummins & Bast, Matton, Ill., for defendant-appellant.

Before BAUER, POSNER, Circuit Judges, and PECK, Senior Circuit Judge.*

BAUER, Circuit Judge.

The defendant in this diversity action, Central National Bank of Mattoon, Illinois, (hereinafter referred to as Bank), appeals from a decision that it defrauded plaintiff, General Motors Acceptance Corporation (GMAC), while providing information about a borrower, Bob Smith Oldsmobile-Cadillac-GMC, Inc. (Dealership). The district court, after a bench trial, found for GMAC and awarded damages of $426,315.83. We affirm the decision as to liability, but reduce the amount of damages awarded.

Since 1975, the GMAC office in Decatur, Illinois, had been doing business with Dealership, a new and used car sales outlet in Mattoon, Illinois. On June 4, 1976, GMAC entered into a wholesale security agreement whereby it would advance funds to Dealership to purchase new automobiles in return for a security interest in the vehicles (or in the proceeds from the sale thereof). In addition, Dealership would make a contract of sale with a car buyer, subject to GMAC's prior approval, and turn it over to GMAC in repayment of the funds that GMAC furnished for the wholesale purchase of the car. When there was a cash sale, Dealership was required to pay off GMAC's financing within twenty-four hours. To allow Dealership immediate access to the proceeds from each sale, GMAC

---

* Honorable John W. Peck, Senior Circuit Judge of the United States Court of Appeals for the Sixth Circuit, sitting by designation.

permitted its owner, Bob Smith, to write retail sight drafts on GMAC funds in a Decatur Bank equal to the dealer's share of each sales contract.

Bank began doing business with Dealership in 1977. Dealership maintained a checking account at Bank. Bank provided wholesale financing for Dealership's used cars, in exchange for a security interest in inventory, under a so-called "floor plan" financing arrangement. On December 21, 1977, Bank lent Dealership $110,000 as capital funds and received as collateral 349½ common shares of Dealership stock and a life insurance policy on Bob Smith. On July 10, 1978, Bob Smith executed a personal note for $5,500 in favor of Bank. By the beginning of 1979 Bank had a total of approximately $320,000 in loans outstanding to Bob Smith individually and to Dealership, which, as the district court noted, was near Bank's legal debt limit.

To ensure that its arrangements were secure, GMAC would periodically mail questionnaires, referred to as IND-B forms, to trade creditors and banks doing business with the car dealers that it served. It is largely because of its responses to these questionnaires concerning Dealership that Bank got into trouble.

GMAC mailed its first IND-B form to Bank on December 30, 1977. Larry Cripe, Loan Officer and Assistant Vice President of Bank, responded that Dealership had no NSF checks and was current on its loans. In response to another IND-B inquiry from GMAC, Cripe indicated that Dealership was maintaining its accounts in a satisfactory manner, with a "medium five figure" balance, and that it was current on loans. Cripe also included a letter to GMAC stating, "If you need any assistance or information in the future, I would be more than happy to assist you."

The misrepresentations found by the district judge apparently started on January 12, 1979, when Cripe, responding to another of GMAC's IND-B forms, stated that Dealership was maintaining a low five-figure balance and was current on its loans. In fact, Dealership was current on its loans

only because it had renegotiated its December 1977 loan (now valued at $91,963). Further, Dealership had a five-figure checking balance on only one day between GMAC's mailing of the questionnaire and Bank's response. On April 2, 1979, Cripe completed another IND-B form, by indicating that Bank had had 15 months of experience with Dealership and, in reference to Dealership's checking account, by responding "no" to the questions, "Any NSF Checks?" and "Any recent overdrafts?" In reality, Bank's statement of account for Dealership reflects a $9,116 negative balance on that very day and two other negative balances on February 19 and March 26, of $32,859 and $6,639, respectively.

Bank lent Bob Smith $15,000 on May 15, 1979, and recorded a mortgage on property owned by Smith and his wife on that day. On May 31, 1979, Dealership executed a note to Bank for a loan of $5,000. Bank gave Bob Smith a $90,000 emergency loan on June 26, 1979, which was deposited in Dealership's account, and recorded three mortgages on property owned by Smith and his wife on July 16, 30 and 31, to cover this loan. During a semiannual review, for the period through June 30, Dealership failed to advise GMAC about the $90,000 deposit from funds that Bank had lent to Smith.

On June 30, 1979, GMAC sent another IND-B form, which Bank returned undated and signed. On it, Bank indicated that Dealership was current on a medium six-figure secured loan but left blank all portions of the questionnaire involving Dealership's checking account. Statements of account to Dealership indicate a negative checking balance on six of eight banking days, between June 15 and June 26, 1979, including a negative balance of $92,198 on June 25.

GMAC had taken Bob Smith's personal guaranty to support Dealership's credit in 1977. As part of GMAC's mid-year review, Bob Smith filed a statement of his personal financial condition as of June 30, 1979. Smith's statement to GMAC failed to disclose the Bank's $15,000 loan of May 15,

1979, the $90,000 loan of June 26, and the $15,000 mortgage on Smith's property. Bank's president, James Singer, admitted at trial that he was concerned about the accuracy of Smith's statements, but Bank never warned GMAC that they were incomplete.

GMAC sent Bank an IND–B form concerning Bob Smith personally on August 30, 1979. Greta Grafton, Bank's Vice President and Chief Cashier, completed the form on September 26, 1979. She indicated that Smith had only a "medium four figure" unsecured loan from Bank. In fact, Bank had at least four mortgages on property owned by Smith, and within the previous five months, had made personal loans to Smith totalling $110,000.[1]

 On October 8, 1979, Greta Grafton executed another IND-B form concerning Dealership, which GMAC had sent on September 28. Grafton indicated that Dealership maintained a low five-figure balance in its checking account, had had no NSF checks or recent overdrafts, and was current on a medium six-figure secured loan. In fact, Bank had sent an overdraft notice to Dealership on August 31, 1979, on a check for $39,270 that had been "paid,"

and an overdraft notice on September 7, 1979, for a $35,660 check that had been "paid." In addition, the record contains seven overdraft notices sent to Dealership in the month of July involving over $78,000 in "paid" checks.[2] The district court found that Bank held checks payable to itself and presented them for payment only when Dealership had made sufficient deposits to cover them. GMAC presented evidence that Bank had been doing this as early as August 30, 1979, thereby giving Dealership a false appearance of solvency. Had the Bank not done so, GMAC contends, Dealership would have been chronically overdrawn.

On October 18, 1979, Bank recorded a mortgage on other real estate owned by Bob Smith. The mortgage was back-dated to May 15, 1979, but states on its face that it was given to secure the $90,000 loan to Smith, although the loan was not made until June 26, 1979.[3]

On Sunday, October 28, 1979, Dealership agreed to sell Don Stone Ford, Inc., of Bloomington, Illinois, sixteen vehicles in exchange for the purchase of thirty older vehicles. Dealership received a check from Don Stone Ford for $122,650 and issued

1. The $90,000 loan of June 26, 1979, by its terms, was repayable quarterly and did not mature until December 20, 1983, and an additional mortgage to secure it was recorded on October 18, 1979. Bank's own records show that as of early October Smith owed $14,254 on the May 15 loan. Thus, what Bank represented to be a medium four figure unsecured debt (including the $5,000 loan of May 31) was actually a partially secured six-figure obligation.

2. Bank president Singer testified that when checks were received for payment they were first sent to Bank's computer, located in another city, which posted the checks and computed an account balance. The next morning the checks were delivered to Bank, which then made a decision to pay or return the checks before the "midnight deadline." Bank Vice President Grafton testified that a customer who made a deposit on the second day to cover the negative balance was not considered an overdrafting customer, and that Dealership made such deposits on each occasion that it had a negative balance. Grafton also testified that the overdraft notices were generated by the computer on the first day that the checks were received.

Bank now argues that the district court erred in concluding that its October 8 IND–B response was deceptive. We disagree. The district court found that there was some dispute among banking experts over the definition of an overdraft. However, the notices to Dealership were sent out under Bank's name and state, "The checks circled above *overdrew* your account." The district court was entitled to weigh the admissions contained therein over the testimony of bank officials in concluding that the Bank's responses to the IND–B were false. In any event, a representation susceptible to two interpretations, one of which is false, can, in some instances, be fraudulent. *See generally* Restatement (Second) of Torts § 527 (1977).

3. GMAC points out that there is a three month period under the Bankruptcy Code, 11 U.S.C. § 547, and a four month period under the Bankruptcy Act of 1898, § 96, *reprinted* in 11 U.S.C.A. § 1161 to End, at 194–99 (West 1979), counting backwards from the date of filing, during which mortgages are voided as "preferences."

three checks totalling $127,350.[4] The next day, Don Stone Ford deposited Dealership's three checks into its bank account in Bloomington, and Dealership deposited the Stone check with Bank. Bank immediately placed Dealership's account on "no-pay" status. Also on October 29, 1979, nine checks to GMAC, drawn on Dealership's account, were presented to Bank. On October 30, Bank's president, James Singer, instructed Greta Grafton to write a letter to GMAC, telling her that it would help both Bank and Dealership. The letter stated:

> The checks drawn on Bob Smith Oldsmobile-Cadillac Mattoon, Illinois being returned by us today, totalling $121,472.89, are being returned "uncollected funds" and we anticipate the funds being collected by November 1, 1979.

Grafton testified that this was the only instance, in her thirty-two year employment with Bank, that Bank had sent such a letter. She also stated that she called the Bloomington bank and found that there were enough funds in Stone's account to cover his checks. She testified, however, that at the time she suspected that Smith and Stone were involved in a check-kiting scheme, although she did not indicate these suspicions in her letter to GMAC. Bob Smith personally delivered the Grafton letter to the GMAC office in Decatur, Illinois, late in the day on October 30, and confirmed that there would be no difficulties in collecting the funds. From October 31 onwards, Jim Bridges, the Assistant Control Branch Manager of the GMAC branch in Decatur, called Grafton daily and was assured that the GMAC checks would clear. At 10:15 a.m. on October 31, 1979, Dealership stopped payment on the three checks it had given to Don Stone Ford. Smith called Don Stone because Bank wouldn't credit Dealership's account until the check from Don Stone Ford was collected. Stone assured Smith that the check was alright, but immediately afterwards went to his own bank and found that Dealership had stopped payment on its three checks.

Stone then stopped payment on the $126,698 check to Dealership.

Don Stone drove to Mattoon to find out what had happened to the agreement with Dealership. When he arrived at Dealership, he found Larry Cripe, Assistant Vice President and Loan Officer of Bank, and Bob Smith meeting on the premises. At this meeting, Stone and Smith exchanged titles to the vehicles involved in the October 28 transaction. Dealership traded sixteen cars to Don Stone Ford, of which three were trust receipted (floor planned) by the Bank and seven were subject to GMAC's security interest. Don Stone Ford traded thirty vehicles to Dealership, and Bank trust receipted all of them in exchange for the three that it had given up. On November 5th or 6th, Don Stone notified GMAC that he had stopped payment on his check. Jack Dolan, GMAC's Branch Manager, then went to Mattoon to meet with Bank's Singer and Cripe. Dolan asked the two whether Bank would honor GMAC's checks. They were evasive. GMAC then suspended Dealership's drafting privileges, cut off Dealership's credit line, and sent a representative to Dealership to monitor GMAC's remaining collateral until repossession.

From October 30 through November 6th, GMAC honored eight retail sight drafts on Dealership's account, totalling $113,235.95. On the other hand, Bank never honored the nine checks, totalling $121,472.89, referred to in its October 30th letter, and, from October 30 through November 13, it refused to honor 14 more Dealership checks to GMAC, totalling $191,605.99. At the same time, Bank withheld deposit of the proceeds from the sale of the thirty floor planned vehicles obtained from Don Stone Ford until November 13, when it deposited $231,350 into the Dealership account and presented and honored $230,775 in Dealership checks payable to itself. GMAC subsequently filed this suit.

---

**4.** The district court noted that this was a curious procedure, in view of the more straightforward method of trading titles to the vehicles together with one net check for the difference in value.

## I.

■ The parties agree that this diversity suit is governed by Illinois law. Under Illinois law, to succeed in an action for fraud a plaintiff must prove: (1) that the defendant made false statements of material fact, (2) knowing that they were false, and (3) intending that the plaintiff would rely on them; (4) that plaintiff did rely, (5) that this reliance was justified, and that (6) plaintiff suffered damage as a result. *See Brayton Chemicals v. First Farmers State Bank*, 671 F.2d 1047, 1050 (7th Cir. 1982); *Soules v. General Motors Corp.*, 79 Ill.2d 282, 286, 37 Ill.Dec. 597, 599, 402 N.E.2d 599, 601 (1980). Even in the absence of a confidential relationship, fraud may be based on a failure to disclose, which together with an affirmative statement or act is misleading, *Shockley v. Ryder Truck Rental, Inc.*, 74 Ill.App.3d 89, 96, 30 Ill.Dec. 20, 24, 392 N.E.2d 675, 679 (1st Dist.1979); and although a statement may be technically true, it may nevertheless be fraudulent where it omits necessary qualifying material, *Perlman v. Time, Inc.*, 64 Ill.App.3d 190, 195, 380 N.E.2d 1040, 1044 (1st Dist.1978).

■ Bank first argues that GMAC did not actually rely on its false statements.[5] Bank cites testimony by Jack Dolan, the GMAC control branch manager in Decatur, that he wasn't sure that he saw Bank's response to the June 30, 1979 form. Bank also contends that the fact that checking account information was left blank on this particular form should have induced GMAC to make follow-up inquiries. From this, Bank concludes that GMAC officials never looked at any IND–B forms that it received from Bank.

■ Bank's argument flies in the face of direct testimony credited by the district judge. Bank itself presented evidence that a GMAC credit supervisor analyzed the IND–B's and prepared a summary for the Decatur branch manager. Bank never indicated any overdrafts on its IND-B responses, from January through November 1979, and it is not surprising, therefore, that GMAC did not conduct a further investigation. A GMAC vice-president and top management officials at the Decatur branch testified that information like that provided on the IND–B forms is critical to GMAC. In light of Bank's other reports, sent both before and after the June 30 IND–B, the fact that GMAC did not react strongly to a single IND–B that was partially blank, undated, and unsigned does not establish that GMAC disregarded all communication from Bank.

■ Bank also argues that GMAC could not have relied Greta Grafton's letter of October 30, which stated that Bank anticipated that funds to cover the returned checks would be collected in Dealership's account by November 1. Bank contends that Smith and Stone were the only two people who could clear the uncollected funds, and that GMAC was in contact with both of them. However, Don Stone did not notify GMAC until November 5 that he had stopped payment on his check and, in any event, Smith and Stone acting alone could not clear up the account because Bank would not credit Stone's check until funds were transferred from his bank. Bank's president knew by October 31, when the two dealers agreed simply to trade titles, that no check from Don Stone would be forthcoming, yet Grafton repeatedly assured Bridges that checks to GMAC would clear. Further, Bank received other funds for Dealership's account but withheld their deposit until November 13. While Bank did not have to conceal receipt of these funds, because it apparently had the right to set off money in Dealership's account against Dealership's debt to it, Bank's use of this right would have alerted GMAC

---

5. By failing, on appeal, to address the district court findings as to the first three elements, Bank has conceded that they were proven. In other words, Bank has waived appellate consideration of these issues. Bank must make an argument to obtain review, it cannot simply "reserve" our consideration of these issues. *See City of Chicago v. United States Department of Labor*, 753 F.2d 606, 607 n. 1 (7th Cir.1985); *United States ex rel. Mitchell v. Fairman*, 750 F.2d 806, 807 (7th Cir.1984).

that Dealership was in serious trouble. Bank points to no evidence that GMAC knew that Bank did not "anticipate the funds being collected by November 1, 1979" as the Grafton letter claimed.[6]

Bank further argues that GMAC did not rely on Bank's assurances that there were no overdrafts in Dealership's account because GMAC's Bridges testified that he occasionally asked Dealership to supply copies of its checking statements. However, Bank did not show that Bridges received such statements during the relevant period in the summer and fall of 1979.

Finally, Bank contends that GMAC could not have acted on the basis of Bank's information because GMAC sent IND–B forms to other merchants and banks doing business with Dealership, and GMAC must have learned from them that Dealership was in shaky financial condition. Only Bank, however, could verify information provided by Dealership about its checking account, the status of the loans from Bank, and the total amount that Bank had loaned to Smith. GMAC believed that Smith's personal guaranty was worth more because Bank failed to disclose the amount of Smith's debt and Bank's encumbrance of his property. Further, GMAC denies that Dealership's financial condition was widely known. GMAC states that it did not receive any adverse information from the IND–B forms issued to trade creditors during 1979 because Bank made undisclosed loans to Smith and withheld payment of its own checks so that Dealership could meet its day-to-day obligations.

 Whether GMAC actually relied on representations by Bank is a question of fact, which we review under the clearly erroneous standard. *See Applications, Inc. v. Hewlett Packard,* 672 F.2d 1076, 1077 (2d Cir.1982). The district court

found that GMAC did rely on Bank's representations, and Bank has provided no argument to leave us with the "definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948). We affirm the district court's finding that GMAC proved actual reliance on Bank's information.

 Given that GMAC did rely on Bank's false representations, Bank argues that such reliance was not reasonable. We disagree. Bank is a national banking corporation, regulated by the federal government. In essence, Bank suggests that such institutions should not be believed when they voluntarily disclose information about their customers to other creditors. The economy runs in large part on credit, and this is possible only because of the exchange of reliable information. Of course, if ample opportunity exists to discover the truth, then reliance on misstatements is not justified. *See Hamming v. Murphy,* 83 Ill.App.3d 1130, 1134, 39 Ill. Dec. 435, 438, 404 N.E.2d 1026, 1029 (2d Dist.1980). However, the facts that Bank and Smith concealed were not widely known. Bank assured GMAC that Dealership had had no overdrafts and failed to disclose the $90,000 loan that was used to bolster Dealership's financial position. It was not necessary for GMAC to go through Dealership's mail to make certain that Bank was not lying. *See Chicago Title & Trust Co. v. First Arlington National Bank,* 118 Ill.App.3d 401, 407–10, 73 Ill.Dec. 626, 631–32, 454 N.E.2d 723, 728–29 (1st Dist.1983).

 Bank also argues that Grafton's statement, in the October 30, 1979 letter, that "we anticipate the funds being

---

**6.** Bank argues that it was actually doing GMAC a favor by sending the letter because otherwise GMAC would not have learned of the overdraft until three to six days later. However, the misrepresentation did not occur when Bank returned the checks, but when it indicated that it anticipated that funds would be collected by November 1. Bank was fully aware that it

would not honor the returned checks on that date either. In any event, there is evidence in the record that GMAC would have immediately received telephonic notice that the check was being returned. *See also* Federal Reserve Regulation J, 12 C.F.R. 210 (1979); Federal Reserve Bank of Chicago Operating Circular No. 4.

collected by November 1, 1979," is a statement of opinion, or a prediction of a future event, and hence is not actionable under Illinois law. *See Barrington Press v. Morey*, 752 F.2d 307, 310 n. 1 (7th Cir.1985); *Bank Computer Network Corp. v. Continental Illinois National Bank & Trust Co.*, 110 Ill.App.3d 492, 501, 66 Ill.Dec. 160, 167, 442 N.E.2d 586, 593 (1st Dist.1982). However, predictions of future events and statements of opinion are actionable when part of a scheme to defraud. *See, e.g., Steinberg v. Chicago Medical School*, 69 Ill.2d 320, 333–34, 13 Ill.Dec. 699, 706, 371 N.E.2d 634, 641 (1977); *Willis v. Atkins*, 412 Ill. 245, 257–61, 106 N.E.2d 370, 376–78 (1952); *Roda v. Berko*, 401 Ill. 335, 340–43, 81 N.E.2d 912, 915 (1948); *Salisbury v. Chapman Realty*, 124 Ill.App.3d 1057, 1063, 80 Ill.Dec. 336, 341, 465 N.E.2d 127, 132 (3d Dist.1984). In this case, Grafton's letter was not an isolated statement but part of a series of misrepresentations by Bank, and the letter worked to Bank's advantage in the same way as Bank's other misleading statements. The longer that Bank could hold off GMAC, and keep Dealership as a going concern, the longer it could obtain proceeds from the sale of vehicles in which it had a security interest. In addition, Bank had an undisclosed interest adverse to GMAC, and this fact is important under Illinois law for recovery for a statement such as this. *See Oltmer v. Zamora*, 94 Ill.App.3d 651, 654, 49 Ill.Dec. 652, 655, 418 N.E.2d 506, 509 (4th Dist. 1981). Bank had treated Dealership's sight drafts, drawn on GMAC's account, as cash and knew that if GMAC had any inkling of trouble it might refuse to honor the drafts when presented. While, to a certain extent, all creditors lending funds to the same debtor are adverse, this adversity becomes clear only after the debtor fails and there are conflicting security interests and insufficient funds to pay off the debts. GMAC never made an unsecured loan to Dealership, and because Bank never disclosed the $90,000 injection of cash that Dealership received from Smith, GMAC did not know that Dealership was so close to failure. We conclude that GMAC was unaware that

Bank's position was adverse to its own, and that statements in the Grafton letter are actionable.

■ Bank also argues that GMAC's reliance on its statements was unreasonable because GMAC was aware that Dealership was operating on a marginal financial position, and, indeed, had never classified the company as a more than "limited" dealership, GMAC's second lowest classification. However, Bank never represented to GMAC that Dealership was profitable or financially sound. Bank is liable in this case for its false statements that Dealership had no overdrafts in its checking account, would be receiving the deposit of funds by November 1, 1979, and that Bob Smith owed only a medium four-figure unsecured debt to Bank. While a recipient of information cannot close its eyes to facts that make it obvious that the information received is false, *see Central States Joint Board v. Continental Assurance*, 117 Ill. App.3d 600, 606, 73 Ill.Dec. 107, 111, 453 N.E.2d 932, 936 (1st Dist.1983), GMAC's knowledge that Dealership was not as profitable as other dealers, and that sales were down, does not make it obvious that Bank's statements about Dealership's checking account and Smith's loans were false.

■ Bank next asserts that GMAC's losses were not caused by its misrepresentations, but by the poor state of the economy in general, and of the car business in particular, which precipitated Dealership's demise. However, Bank's argument presupposes that it is being held accountable for all of GMAC's losses attributable to the collapse of Dealership. It is not. The district court gave no indication that Bank was responsible for Dealership's collapse, and that is not plaintiff's theory of the case. Properly phrased, the issue in this case is: given Dealership's precarious financial condition, would GMAC have been better off had Bank responded truthfully to its inquiries? The district court answered yes, finding that had GMAC known of the overdrafts and Bank's loans to Smith, it would have "taken quick steps to secure its position." The district court found, for ex-

ample, that but for its reliance on the false statements by Bank, GMAC would have withdrawn sight drafting privileges from Dealership and would have maintained closer surveillance on the financed inventory. In addition, GMAC states in its brief that, had it known the true financial condition of Dealership, it would have required direct payment of proceeds, reviewed all its security agreements with Dealership, reduced Dealership's credit line, placed employees on Dealership's premises to guard the collateral, and required Dealership to move its account to a bank with which it did not maintain loans. We have already rejected Bank's argument that GMAC did not actually rely on Bank's statements. The district court's finding that Bank's representations were the cause in fact of injuries to GMAC is a question of fact, which we review under the "clearly erroneous" standard. *Cf. Grover Hill Grain Co. v. Baughman-Oster Inc.*, 728 F.2d 784, 794 (6th Cir.1984). The district court's findings in this regard are not clearly erroneous.

Bank next argues that even if its statements to GMAC contributed to GMAC's losses, they were not the proximate cause of GMAC's injury. Bank asserts that GMAC lost money because of the failure of Dealership and that GMAC itself brought this about because it accepted twenty-six retail installment contracts in which Dealership was both buyer and seller, each providing for monthly payments of $8,933. There was testimony, however, that such purchases were common industry practice, and that the cars were intended for use as demonstrator models. Bank itself accepted contracts in which Dealership was both buyer and seller. Bank seeks to isolate one of Dealership's costs of doing business and hold it out as the ruin of Dealership, based on the mere coincidence that the expense was owed to GMAC. Bank produced no evidence that GMAC induced Dealership to purchase 26 demon-

strator models or that this was an excessive number under industry practice.

Bank next contends that its misrepresentations did not proximately cause GMAC's losses because, based on other information that it had, GMAC should have taken steps to protect its position and "pulled in the reins" on Dealership. In particular, Bank argues that on March 31, 1979, GMAC knew that Dealership had sold 18 fewer cars than it needed to break even for the month, that on June 30, 1979, Dealership's sales were down ten percent and profits were down sixty-four percent from the previous year, and that on that date Dealership had net-scaled quick assets (a rough measure of the liquidation value of a business) of negative $19,657. Bank argues that, despite this knowledge, GMAC imprudently allowed Dealership to maintain a credit line of 80 cars,[7] allowed Dealership to hold certificates of origin on new cars so that purchasers could obtain title directly from Dealership,[8] and allowed Dealership to continue sight drafting privileges. In short, Bank argues that GMAC's business practices, rather than Bank's false statements, proximately caused GMAC's losses. We reject Bank's argument.

Under Illinois law, Bank's fraud need only be the proximate cause and not the sole cause of GMAC's loss. *See Mother Earth Ltd. v. Strawberry Camel, Ltd.*, 72 Ill.App.3d 37, 49–50, 28 Ill.Dec. 226, 237, 390 N.E.2d 393, 404 (1st Dist. 1979). *See also* W. PROSSER, LAW OF TORTS 715 (4th ed. 1971). Clearly, Bank knew that its misrepresentation and suppression of information would induce GMAC to continue financing Dealership, because the district court found that Bank intended to bring about just such a result to protect loans that it made to Dealership and to Bob Smith as an individual. Further, Bank could foresee that its statements that Dealership had had no overdrafts and that funds would be forthcoming by November

---

7. Bank argues that Dealership was actually periodically over its credit line on new cars, but GMAC contends that Bank's method of counting such new cars is incorrect in that it improperly includes demonstrator and rental models.

8. GMAC argues that holding title documents does not protect a secured creditor who finances a car dealer's inventory. *See* Ill.Rev. Stat. ch. 26, §§ 2–403(2), 9–307(1) & (2).

1 would induce GMAC to continue to accept Dealership's checks as payment. At most, Bank's argument boils down to a suggestion that GMAC was negligent in its business practices. However, Bank's misrepresentations were deliberate, and GMAC's contributory negligence is not a defense to liability for an intentional tort. *See Cenco, Inc. v. Seidman & Seidman*, 686 F.2d 449, 454 (7th Cir.1982), *cert. denied*, 459 U.S. 880, 103 S.Ct. 177, 74 L.Ed.2d 145 (1982); *Commercial National Bank of Peoria v. Federal Deposit Insurance Corporation*, 131 Ill.App.3d 977, 982, 87 Ill.Dec. 107, 111, 476 N.E.2d 809, 813 (3d Dist.1985); *Carter v. Mueller*, 120 Ill.App.3d 314, 320, 75 Ill. Dec. 776, 781, 457 N.E.2d 1335, 1340 (1st Dist.1983). Although a reasonable finance company, based on the information already possessed by GMAC, might have taken earlier steps to secure its position, the district court found that GMAC did not take such steps because of the false statements by Bank. It is conceivable that a company could embark on a course of foolhardy lending and then, after the debtor's collapse, attempt to place the burden of its own irresponsibility on another creditor that, by chance, had supplied it with incorrect information—however, that is not this case. Bank played a direct and active role in causing GMAC to treat Dealership as a company in better financial position than it was. Bank's deliberate failure to report the $90,000 loan to Smith, which was in turn deposited in Dealership's account, as well as Bank's other misrepresentations, created a false impression of Dealership's financial soundness. The district court concluded that Bank's representations proximately caused GMAC's losses. We agree.

## II.

The district court awarded $426,315.83 in damages against Bank. The sum, which the court concluded was GMAC's loss directly resulting from Bank's misrepresentations, consisted of $121,472.89, representing the nine checks returned by Bank on

October 30, 1979, $191,605.99,[9] representing fourteen checks returned by Bank subsequent to October 30, 1979, and $113,235.95, representing eight retail sight drafts honored by GMAC between October 30, 1979 and November 6, 1979.

GMAC originally sought $782,425 in damages, based on a theory that Bank converted collateral and proceeds subject to GMAC's security interest under Ill.Rev. Stat. ch. 26 § 9–312(5). The district court did not discuss this issue in depth, but held that a creditor must establish underlying debt before it can recover on the proceeds of collateral. The district court found that there was no evidence in the record to establish how much money Dealership owed GMAC after its default, and concluded that GMAC was not entitled to damages for conversion of collateral because of this failure of proof. GMAC has not cross-appealed this decision, and thus, we have no occasion to review it. However, the judge's finding that there was no evidence to establish Dealership's indebtedness to GMAC is crucial to an issue raised on this appeal: GMAC's damages for misrepresentation.

A plaintiff in a suit for misrepresentation is entitled to recover its out-of-pocket losses caused by the fraud. *See Commercial National Bank of Peoria v. Federal Deposit Insurance Corp.*, 131 Ill. App.3d 977, 981, 87 Ill.Dec. 107, 111, 476 N.E.2d 809, 813 (3d Dist.1985); *Lee v. Heights Bank*, 112 Ill.App.3d 987, 998, 68 Ill.Dec. 514, 522, 446 N.E.2d 248, 256 (3d Dist.1983). The district court found that GMAC would have suspended Dealership's sight drafting privileges were it not for misrepresentations made by Bank. However, although GMAC successfully established that Bank fraudulently caused it to honor $113,235.95 in retail sight drafts between October 30 and November 6, 1979, it did not establish that the total sum was a loss.

The district court found that the retail sight drafts were drawn on GMAC

9. The district court opinion states that the fourteen checks total only $91,605.99. However, the specified checks contained in the record add up to $191,605.99 and, based on total sum awarded, we conclude that this lower figure was a typographical error.

funds in a Decatur bank, and were equal to the dealer's share of a retail sales contract. GMAC allowed Dealership to use the privilege each time it provided GMAC with a retail sales contract from a customer. The bulk of each sales contract that Dealership gave to GMAC was in repayment of the credit that GMAC had provided so that Dealership could buy the car in the first place, plus interest and GMAC's charges. However, GMAC was not entitled to the full value of each retail sale, and Dealership was allowed to write a sight draft to cover the portion of the contract belonging to it. Of course, sight drafting privileges were helpful to Dealership, because they gave it immediate access to cash, while the retail sales contracts were repaid by car buyers in installments. In addition, GMAC had the right of setoff, so that it could claim the full amount of a retail sales contract to cover money Dealership owed, and thereby deny Dealership its share on a particular sale. GMAC now claims that but for Bank's misrepresentations it would have exercised this right of setoff and, therefore, would not have honored any sight drafts after October 30, 1979. But GMAC would have this right only as long as Dealership owed it money. This is where GMAC's failure of proof is critical. The sight drafts represented money that GMAC owed Dealership and, by failing to establish the degree to which Dealership was still indebted to it, GMAC failed to establish that honoring the sight drafts actually represented a loss. Consequently we are constrained to reverse $113,235.95 of the damage award, which represents the value of the eight retail sight drafts paid by GMAC after October 30, 1979.

■ On the other hand, the checks that Bank refused to honor, standing alone, are evidence of money that Dealership owed to GMAC. Because Bank presented no evidence that the checks were given by Dealership as gifts, it is obvious that they were accepted by GMAC in exchange for GMAC's having given something of value. When GMAC thought it was getting $313,-

078.88 in exchange for equivalent value,[10] it was actually getting worthless paper, because Bank refused to honor the checks and there are now no funds in Dealership's account to cover their face value. Thus, GMAC has proven $313,078.88 of loss.

■ Bank argues that GMAC has not shown that it did not receive money for these checks from some other source. However, payment is an affirmative defense which must be pled and proved by the defendant. *Cormier v. Oceanic Contractors, Inc.* 696 F.2d 1112, 1113 (5th Cir.), *cert. denied,* — U.S. ——, 104 S.Ct. 85, 78 L.Ed.2d 94 (1983); Rule 8(c), Fed.R. Civ.P. *See also Konczak v. Johnson Outboards,* 108 Ill.App.3d 513, 517, 64 Ill.Dec. 87, 439 N.E.2d 16, 19 (2d Dist.1982). Bank has not shown that GMAC received payment from any other source for the debt established by the existence of the checks, and, thus, its argument must fail.

The decision of the district court is AFFIRMED in part and REVERSED in part. Damages are hereby reduced to $313,-078.88. Each side is to bear its own costs on this appeal.

---

**10.** Because there is no showing that these checks represented gifts, it was unnecessary for

GMAC to show what each check was in payment for.