12

## CIRCUIT COURT OF FAIRFAX COUNTY

Bernard E. Williams and
Florence M. Williams

v.

Ronald G. Chamer,
Cynthia A. Chamer,
RGC Enterprises, Inc., and
Thomas D. Throckmorton

March 25, 1993

Case No. (Law) 101851

BY JUDGE ARTHUR B. VIEREGG, JR.

This action at law came before the court for *ore tenus* hearing on March 17 and 18, 1993. I have considered the pleadings, the evidence,

and the authorities furnished by counsel. The remaining issues in this case are now ripe for decision.

## Parties

This case arose out of the actions of Ronald G. Chamer ("Chamer") in forming a corporation, Popeye's of Martinsburg, Inc. ("Popeye's/ Martinsburg"), to operate a franchised fried chicken and biscuit restaurant in Martinsburg, West Virginia. Popeye's/Martinsburg was incorporated in December, 1988. On January 3, 1991, Popeye's/ Martinsburg filed a Chapter 7 bankruptcy petition. On December 19, 1990, the plaintiffs, Bernard E. Williams and his wife, Florence M. Williams (collectively the "Williamses"), filed a motion for judgment against Chamer; Chamer's wife, Cynthia A. Chamer ("Mrs. Chamer"); and RGC Enterprises, Inc. ("RGC"), a corporation formed and controlled by Chamer. They claimed damages of $50,000 suffered in connection with their investment in Popeye's/Martinsburg.

After being granted leave to amend their pleadings by order of this Court, on February 20, 1992, the Williamses filed an Amended Motion for Judgment adding defendant, Thomas D. Throckmorton. He, in turn, filed cross-claims against the Chamers and RGC. These cross-claims were nonsuited at the beginning of trial.

On October 31, 1990, RGC filed a petition in bankruptcy. On January 16, 1991, Chamer did so as well. As a consequence, the Williamses' actions against RGC and Chamer were automatically stayed pursuant to the provisions of Title 11, Section 362, of the United States Code. Orders staying this action against RGC and Chamer were entered herein on July 10, 1992.

Prior to trial, Mr. Williams died. Without objection by the defendants, Mrs. Williams has prosecuted this action in her own stead and as successor-in-interest to her deceased husband, seeking damages against the remaining defendants, Mrs. Chamer and Throckmorton on five theories of recovery: (1) breach of contract (Count I); (2) violation of the Virginia Securities Act (Count II); (3) common law fraud (Count III); breach of fiduciary duty (Count IV); and (5) *alter ego* liability (Count V). At the conclusion of Mrs. Williams' case-in-chief, the Court struck Counts I and V, no credible evidence having been presented either that the Williamses were in privity with remaining defendants or that those defendants had employed Popeye's/Martinsburg as

an *alter ego* for their individual business activities. Counts II, III, and IV remain for decision.

## The Facts

From the evidence presented and the credibility and demeanor of the witnesses, the court finds the following facts.

In the fall of 1988, RGC was the majority shareholder of a corporation known as Popeye's Famous Fried Chicken & Biscuits of Winchester, Inc. ("Popeye's/Winchester"). Chamer was RGC's president and controlling shareholder. Popeye's/Winchester owned and operated a restaurant in Winchester, Virginia which sold fried chicken and biscuits under the "Popeye's" tradename.

Defendant Throckmorton is a Winchester, Virginia, attorney who performed legal work for Chamer's corporations, RGC and Popeye's/ Winchester, from 1987 until sometime after this action was filed. At all times relevant hereto, Throckmorton's law practice has been a general practice which included the handling of some corporate business matters.

In 1987, Throckmorton invested $100,000 in RGC pursuant to an oral agreement with Chamer providing that Throckmorton would receive stock in RGC and a twenty percent interest in any future corporation set up by RGC or Chamer "in connection with the franchising of Popeye's Famous Fried Chicken & Biscuits." Throckmorton understood that such new corporations would be capitalized by Chamer from the profits of the earlier fried chicken restaurants and that in the future Chamer intended to contribute nominal funds to capitalize such restaurants.

In the fall of 1988, Chamer approached the Williamses and inquired if they might know people interested in investing in a new Popeye's restaurant business he planned to start in Martinsburg, West Virginia. Chamer represented that during the previous year he had realized a twenty percent return on his investment in the Winchester operation. As a consequence of those overtures, the Williamses expressed an interest in investing in the Martinsburg restaurant venture. In a letter to the Williamses, Chamer wrote:

> [Y]ou will become a ten percent shareholder in the new store (Popeye's of Martinsburg, Inc.) for an investment of $50,000. While I don't anticipate any dividends or distributions for a year or two, it is my belief that your ongoing return should

average fifteen or more percent per year, excluding the appreciation in the value of the property.[1]

A revised Investors Agreement was enclosed for execution by the Williamses.

The revised Investors Agreement was subsequently signed by Chamer on behalf of RGC and by the Williamses. Pursuant to its terms, the parties agreed, in part, as follows:

1. That the Williamses and RGC would join to form Popeye's/Martinsburg as a Sub-Chapter S corporation.

2. That the Williamses would initially contribute $50,000 to Popeye's/Martinsburg and would receive ten percent of the stock.

3. That RGC would initially contribute $450,000 to the corporation and would receive ninety percent of the stock.

Pursuant to the terms of the Investors Agreement, the Williamses paid $50,000 to RGC by checks in the amount of $25,000 each, respectively dated October 30 and November 12, 1988.

In the late fall of 1988, Throckmorton learned that the Williamses had agreed to invest $50,000 in return for a ten percent interest in Popeye's/Martinsburg. He confronted Chamer fearing that Chamer would not honor his agreement that Throckmorton was to have a twenty percent interest in any new corporation formed by Chamer to operate Popeye's restaurants. Chamer and Throckmorton orally agreed that Throckmorton would receive eighteen percent of Popeye's/Martinsburg (20% of the Chamers' 90% share).

In the late fall or early Winter of 1988, Chamer hired David Layva, an attorney in Charles Town, West Virginia, to handle the incorporation of Popeye's/Martinsburg. On December 16, 1988, Popeye's of Martinsburg, Inc., was incorporated as a West Virginia corporation. Its articles of incorporation provided (i) that the initial directors of the corporation would be Chamer, Mrs. Chamer, and Throckmorton, and (ii) that those persons would serve as initial directors of the corporation until the first annual meeting of shareholders. Such a meeting was never held.

Despite the provisions contained in the articles of incorporation, Mrs. Chamer never knew or agreed to serve as a director of Popeye's/

---

[1] As both Throckmorton and Chamer testified, Popeye's/Martinsburg bought the restaurant and site from the owners of a defunct "Arby's" restaurant with funds borrowed from local banks.

Martinsburg. Throckmorton, however, did know that he was an initial director of the corporation. Preparation of the corporate documents was delayed in order that Chamer might decide how his majority stock interest would be held: jointly by his wife and him, or by RGC.

In the course of his preparation of the corporate documents between late December, 1988, and April, 1989, Layva met with Chamer but also engaged in several conversations with Throckmorton. In the course of those discussions, the following occurred:

1. Layva and Throckmorton discussed the Investors Agreement between RGC and the Williamses.

2. Layva and Throckmorton discussed the fact that RGC could not own stock in Popeye's/Martinsburg if that corporation was to qualify as a Subchapter S corporation for federal tax purposes.

3. Layva and Throckmorton discussed the identity of each of the persons who would serve as directors of Popeye's/Martinsburg, including the fact that Throckmorton himself would serve as a director.

4. Layva and Throckmorton discussed (1) the identity of each of the persons who would own stock in the corporation, namely the Williamses, the Chamers, and Throckmorton; (2) the amount of stock each shareholder would receive; and (3) the "value" of the consideration paid by each shareholder for his stock.

5. Layva and Throckmorton also discussed the necessity that RGC's stock be taken by the Chamers and Throckmorton, rather than RGC, because of the Subchapter S corporation federal tax considerations.

At trial, substantial testimony was elicited and many exhibits were introduced with respect to the preparation and execution of Popeye's/Martinsburg corporate documents. The court makes the following findings with respect to those documents.

1. Between late December, 1988 and April, 1989, Mr. Layva prepared the following Popeye's/Martinsburg documents in blank ("Layva Corporate Documents"):

a. Minutes of Organization Meeting. (Pl. Ex. 4.)

b. At least two Waivers of Notice of First Meeting of Board of Directors. (Pl. Exs. 5, 6.)

c. Minutes of First Meeting of Directors. (Pl. Ex. 7.)

d. Stock certificates reflecting that the Chamers, the Williamses, and Throckmorton respectively owned 3600, 500 and 900 shares of stock in the corporation. (Pls. Exs. 10, 11, 12.)

e. Minutes of First Meeting of Shareholders. (Pl. Ex. 15.)

f. By-Laws (Pl. Ex. 16.)

g. Corporate Record Sheet. (Pl. Ex. 17[4A].)

h. At least three Waivers of Notice of First Meeting of Shareholders. (Pl. 19.)

2. Layva caused the blank Layva Corporate Documents to be delivered to Chamer.

3. Chamer thereafter caused the Layva Corporate Documents to be delivered to Throckmorton, who, through carelessness, executed certain of them as "Secretary of the Meeting" or "Secretary," despite the fact that he did not hold those positions.

4. Throckmorton discovered a subscription agreement from Chamer in the Layva Corporate Documents delivered to [him], which indicated that Throckmorton would pay $90,000 in cash to Popeye's/Martinsburg for his 18% stock interest. Upon seeing the subscription agreement which was inconsistent with his oral agreement with Chamer, Throckmorton interlineated the following language: "Per previous agreement, and on its terms" immediately before the following paragraph, after which he signed his name:

> I hereby accept the offer stated above upon the terms and conditions contained in the above statement. I also acknowledge that I am purchasing the stock and securities indicated above for investment purposes and not for the purpose of reselling the stock or securities.

> *[signature of Throckmorton]*

5. No initial meeting of directors, no first directors meeting, and no initial meeting of shareholders of Popeye's/Martinsburg were ever held, nor anticipated by Layva, Chamer or Throckmorton.

6. The failure to hold the meetings described in paragraph 4 was not occasioned by an attempt to defraud the Williamses but rather was an expedient way to form a small close corporation.

As a consequence of discussions between Layva and Throckmorton, Layva prepared Popeye's/Martinsburg stock certificates for the following people in the following amounts:

| | |
|---|---|
| Thomas Throckmorton | 900 shares |
| Bernard E. Williams or Florence M. Williams | 500 shares |
| Ronald G. Chamer or Cynthia A. Chamer | |
| as joint tenants with right of survivorship | 3600 shares |

Throckmorton never paid any money to Popeye's/Martinsburg for his eighteen percent stock interest in that corporation; Chamer paid $4,000 for the seventy-two percent stock interest of his wife and himself; and the Williamses paid $50,000 for their ten percent stock interest.[2] The business was principally capitalized by several thousands of dollars in loans obtained by the corporation from local West Virginia banks.

At no time prior to the fall of 1991 were the Williamses ever informed by either of the Chamers or Throckmorton of any of the following facts: (1) that RGC was not be a shareholder of Popeye's/Martinsburg; (2) that Throckmorton and the Chamers were shareholders; (3) that, in the aggregate, the Chamers and Throckmorton were contributing far less for their combined ninety percent stock interest in the corporation than the $50,000 paid by the Williamses for their ten percent stock interest.

Except for the Investors Agreement and the October 28, 1988, Chamer letter to the Williams, there is no evidence that the Williamses either saw or relied upon the Layva Corporate Documents or other documents in connection with any action they took, or did not take, with respect to their investment in Popeye's/Martinsburg.

A party celebrating the opening of the Popeye's/Martinsburg restaurant was held on February 14, 1989. The Chamers, the Williamses, and Throckmorton all attended the party. However, no business matters were discussed. The restaurant operated as a fried chicken restaurant until Chamer unilaterally converted it into "Ron's Sports Bar." Sometime in the early summer of 1990, Chamer advised the Williamses that they had no interest in that venture.

The Williamses experienced difficulty obtaining K-1 tax forms from Chamers for the 1988 and 1989 tax years. The Williamses never received nor asked for delivery of stock certificates reflecting their ten percent interest in Popeye's/Martinsburg.

In the aftermath of the failure of Popeye's/Martinsburg, the Williamses retained counsel and this suit was initiated against RGC and the Chamers. The Williamses learned of Throckmorton's involvement as a director of the corporation in October, 1991, when Throckmorton fur-

---

[2] Thus the Williamses paid 92.6% of all monies paid by all of the shareholders for only 10% of the corporation's stock. The corporation's directors, the Chamers and Throckmorton, paid only 7.4% of such monies for 90% of the stock.

nished Popeye's/Martinsburg corporate documents to Mrs. Williams' counsel.

## Decision

At the beginning of the trial, counsel for the defendants characterized Mrs. Williams' cause of action as simply her attempt to recoup losses she had sustained from a poor investment. The court rejects that characterization. Based upon the evidence adduced at trial, it is the court's firm view that the Williamses were the victim of intentional fraudulent conduct perpetrated by Ronald G. Chamer. However, because insufficient proof was introduced to prove that either Mrs. Chamer or Throckmorton acted in concert with Chamer, in its present posture this case essentially involves issues of alleged liability of those remaining defendants arising from their potential status as officers or directors of Popeye's/Martinsburg and the extent of information related to Chamer's conduct of which they may have known or should have reasonably acquired by the exercise of reasonable care.

1. *The Causes of Action Against Cynthia Chamer*

Counts II and IV against Mrs. Chamer are each premised upon fiduciary duties owed by her to the Williamses as a consequence of her purported positions as officer and director of Popeye's/Martinsburg.

Acceptance by a designated officer or director of his or her position is generally necessary for a person to become an officer or director of a corporation. Am. Jur. 2d, *Corporations*, § 1364 at 272 (1985). *Christ v. Lake Erie Distributors, Inc.*, 273 N.Y.S.2d 878, 883 (1966) (citing *Cameron v. Seaman*, 69 N.Y. 396, 398). Furthermore, while notification to a person of election to an office or directorship gives rise to a presumption that the office has been accepted, that presumption may be rebutted. *Lake Erie*, 273 N.Y.S.2d at 883 (citing *Halpin v. Mutual Brewing, Co.*, 47 N.Y.S. 412, 414). *Cf. Danville & Western R.R. Co. v. Brown*, 90 Va. 340 (1893).

The Williamses' evidence at trial, however, only showed that in corporate documents Mrs. Chamer was designated as an officer and director of Popeye's/Martinsburg. Those documents, however, did not bear her signature. Mrs. Chamer's testimony established, moreover, that she did not know that she had been designated an officer or director of the corporation and that she did not have substantial knowledge of any of the business affairs of Popeye's/Martinsburg. Since Mrs.

20

Williams has not proved that Mrs. Chamer ever became an officer or director of Popeye's/Martinsburg, she has failed to prove that Mrs. Chamer owed fiduciary duties to her (or anyone) in connection with Popeye's/Martinsburg. Counts II and IV against Mrs. Chamer must therefore be dismissed with prejudice.

The Williamses also seek to recover a judgment against Mrs. Chamer based on common law fraud. The elements of common law fraud are the following: (1) a false representation, (2) of a material fact, (3) made intentionally and knowingly, (4) with intent to mislead, (5) reliance by the party misled, and (6) resulting damage to the party misled. *Winn v. Aleda Construction Co.*, 227 Va. 304, 308 (1984) citing *Chandler v. Satchell*, 160 Va. 160, 171–2 (1933). Mrs. Williams has the burden of proving each of these elements by clear and convincing evidence. *Id.* (citing *Wolford v. William*, 195 Va. 489, 498 (1953)).

Mrs. Williams has presented no evidence that Mrs. Chamer either made any misrepresentations to the Williamses or that Mrs. Chamer possessed knowledge of material facts about the affairs of Popeye's/Martinsburg which she might have concealed from them. Similarly, there is no evidence that the Williamses had reason to rely, or did rely, upon her in connection with their initial investment in Popeye's/Martinsburg or their failure to seek the return of their investment in Popeye's/Martinsburg. In view of her lack of proof, Count III against Mrs. Chamer must also be dismissed with prejudice.

### 2. Causes of Action Against Throckmorton

Unlike, Mrs. Chamer, Throckmorton admitted that he was a director of Popeye's/Martinsburg. Furthermore, the Williamses' evidence demonstrated that he possessed substantial information with respect to the formation and capitalization of the corporation. In view of these circumstances, the remaining three counts against him require more protracted discussion.

### (a) The Virginia Security Act — Count II

At trial, Mrs. Williams' evidence established that Popeye's/Martinsburg issued stock certificates to the Williamses in return for their earlier payment and delivery to Chamer, its president, of two checks aggregating $50,000. Her evidence established that the sale was made "by means of . . . untrue statement[s] of . . . material fact[s]" within the meaning of Va. Code § 13.1–522(A), i.e., Chamer's representation that ninety percent of the Popeye's/Martinsburg stock would be issued to

RGC in return for the payment of $450,000; and that no other stock would be issued by the corporation. Her evidence further established that the sale was made "by means of . . . [an] omission to state a material fact necessary in order to make the statement[s] made [by Chamer], in the light of the circumstances under which they were made, not misleading . . ." within the meaning of the same statute, i.e., Chamer concealed the facts that eighteen percent of the Popeye's/ Martinsburg stock would be issued to Throckmorton for nothing and seventy-two percent would be issued to the Chamers for $4000, a combined amount considerably less than that paid by the Williamses for only ten percent of the corporation's stock. Accordingly, it is clear to the court that on account of Chamer's fraudulent conduct, Popeye's/ Martinsburg was liable to the Williamses for violation of § 13.1–522(A).

Va. Code § 13.1–522(C) provides that every controlling person of a seller violating the Virginia Securities Act, "including every . . . officer, or director" of such a seller:

> shall be liable jointly and severally with and to the same extent of such person [the seller] *unless able to sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the existence of facts by reason of which the liability is alleged to exist.*

(Emphasis added.) Based upon the evidence elicited at trial, the liability of Throckmorton pursuant to the Virginia Security Act arises, if at all, by virtue of his status as a director and therefore a controlling person of Popeye's/Martinsburg pursuant to Section 13.1–522(C). As a controlling person, he is potentially liable to Mrs. Williams to the same extent as Popeye's/ Martinsburg *unless* he can sustain his burden of proof (1) that he did not know of Chamer's misrepresentations to, and concealment of material facts from, the Williamses, *and* (2) that in the exercise of reasonable care he could not have learned of Chamer's misrepresentations and concealments.

Throckmorton testified that he did not know the terms of the Investors Agreement. Although some of the terms of that Agreement were discussed with Mr. Layva, the court accepts Throckmorton's testimony that he did not know all of the specific terms of the Investors Agreement and by implication that he did not know of Chamer's representations to, and concealments from, the Williamses. It is nevertheless

also the opinion of this court that he has failed to sustain the burden placed upon him as a controlling person pursuant to Section 13.1–522(C) to disprove the presumption that he could have discovered Chamer's fraud by the exercise of reasonable care on account of facts which were known to him. Among those facts known by him are the following:

1. That the Williamses were paying $50,000 for 10% of the Popeye's stock, while the Chamers and he were paying virtually nothing for 90% of the stock.

2. That the Popeye's/Winchester had suffered cash flow problems in the recent past requiring Throckmorton to loan $20,000 to the company which loan had still not been repaid in the Winter of 1988–89.

3. That Popeye's/Martinsburg corporate documents in his possession disclosed $450,000 in payments for stock by the Chamers and him which in fact were neither made nor contemplated.

4. That the corporation's attorney in West Virginia had been led to believe by Chamer that he, Throckmorton, would be paying $90,000 in cash to the corporation for his stock.

5. That he had received a subscription agreement from Chamer indicating that Throckmorton had paid $90,000 for his 18% interest in the corporation, a fact he knew was not correct.

6. That the Williamses had agreed to pay $50,000 for 10% of the Popeye's/Martinsburg stock, when the remaining shareholders were paying virtually nothing for 90% of the corporation's stock.

Despite this knowledge, Throckmorton testified (1) that he considered himself merely to have been an investor; (2) that he did not know of the specific terms of the Investors Agreement signed by the Williamses and by Chamer (on behalf of RGC); and (3) that he was otherwise ignorant of what Chamer had told the Williamses. He essentially contended that he therefore had no obligation to investigate the suspicious circumstances known to him about the Williamses' investment in Popeye's/Martinsburg.

The difficulty with Throckmorton's position is that he was more than an investor. He was both a director and therefore a controlling person of Popeye's/Martinsburg. In that capacity, he could not reasonably have ignored facts suggesting that the Williamses were buying stock in the corporation under false pretenses without exposure for controlling person liability.

At trial, counsel for Throckmorton argued that Mrs. Williams' Security Act claim had not been established because she failed to prove that her injuries were caused by Chamer's fraud. That position lacks merit for two reasons. First, Chamer's fraud principally was one based upon what he concealed from the Williamses. As Judge Carter observed in *McCowan v. Sears Roebuck and Co.*, 722 F. Supp. 1069, 1075 (S.D. N.Y. 1989), with respect to the Virginia Security Act: "in non-disclosure cases it is not necessary to allege and prove reliance and causation." Second, it is manifest that, but for Chamer's failure to disclose the true facts surrounding the contributions of the other shareholders in Popeye's/Martinsburg to the Williamses, the Williamses would surely have sought and received the return of their investment. Given the fact that the corporation was able to continue as a viable, operating entity until 1992 (presumably as a consequence of the loans received from local banks), there is a sufficient evidentiary basis for the Court to conclude that had the Williamses known all of the facts surrounding their investment, they would have recovered the monies paid for their stock. *General Motors Acceptance Corp. v. Central National Bank*, 773 F.2d 771, 782–3 (7th Cir. 1985).

(b) *Statute of Limitations*

Defendant Throckmorton, however, claims that Mrs. Williams' claim under Va. Code § 13.1–522(C) is barred by the two year statute of limitations contained in Section 13.1–522(D) of the Act. In response, Mrs. Williams has conceded, as she must, that the applicable limitations period is two years. She claims, however, pursuant to § 8.01–249, that the limitations period did not accrue until she discovered, or by the exercise of due diligence reasonably should have discovered, Chamer's fraud. She further contends (i) that she did not discover his fraud until approximately June, 1990 when she learned from Chamer that he had changed the name of the Martinsburg restaurant to "Ron's Sports Bar"; and (ii) that she could not have learned of Throckmorton's involvement until her counsel received Popeye's/Martinsburg corporate records in October, 1991.

The Supreme Court of Virginia has not addressed the question of whether the accrual of securities fraud actions under § 13.1-522 are governed by Va. Code § 8.01–249(1). However, in a well reasoned opinion, Judge Bryan of the United States District Court for the Eastern District of Virginia opined that the express inclusion by the Gen-

eral Assembly of language in Section 13.1-522(D) providing when a Virginia Securities Act claim accrues, i.e., two years after the subject transaction, necessarily negates a legislative intent that the more general provisions of Section 8.01-249(1), the Virginia "discovery rule", applies to such claims. *Cors v. Langham*, 683 F. Supp. 1056, 1059 (E.D. Va. 1988). In other words, had the Virginia General Assembly intended such claims to accrue upon the discovery of a violation of the Virginia Securities Act, it would have expressly incorporated such "discovery rule" language into Section 13.1-522(D). This Court finds Judge Bryan's reasoning to be persuasive.[3] Mrs. Williams' Virginia Securities Act cause of action therefore was barred two years after the transaction, sometime no later than the spring of 1991. Her Securities Act Claim against Throckmorton therefore was filed too late and is barred and must be dismissed with prejudice.

### (c) Count III — Common Law Fraud

The elements of common law fraud have been stated previously in this opinion. Again, Mrs. Williams has the burden of proving each of those elements by clear and convincing evidence. *Winn*, 227 Va. at 308 (citing *Wolford v. Williams*, 195 Va. 489, 498 (1953)).

The court concludes that she has wholly failed to sustain that burden. She has presented no evidence tending to prove either an *intentional* misrepresentation or concealment by Throckmorton of material facts. Although Throckmorton did possess important information with respect to the capitalization, shareholders, and the amount of the shareholders' monetary contributions to Popeye's/Martinsburg, Mrs. Williams' evidence does not demonstrate a conscious intention on his part to conceal such information from the Williamses.

Likewise, Mrs. Williams' evidence shows that she and her husband did not rely upon Throckmorton for information in connection with making or failing to recover their investment in Popeye's/Martinsburg. Indeed, the Williamses did not know Throckmorton when they invested in Popeye's/Martinsburg, nor did he know them. They did not

---

[3] Mrs. Williams reliance on *Mills v. Roanoke Ind. Loan & Thrift*, 70 F.R.D. 448 (W.D. Va. 1975), and similar decisions is misplaced. Those decisions each involved cases in which a federal court borrowed a state statute of limitations. In such circumstances, the federal discovery rule of accrual applies. In this state court action, of course, the federal accrual rule is inapplicable.

meet until the opening of the restaurant in February, 1989, and even then no business matters were discussed.

For the foregoing reasons, Mrs. Williams' common law fraud count must be dismissed with prejudice.

Throckmorton also raised the statute of limitations as a defense to plaintiff's common law fraud count. He correctly stated that actions resulting from fraud must be brought within two years after accrual of the cause of action. Va. Code § 8.01–243(A). He also noted correctly that an action for fraud is deemed to accrue when such fraud is discovered or by the exercise of due diligence reasonably should have been discovered. Va. Code § 8.01–249(1). He contends that all of the actions complained of took place in the fall of 1988 and, with due diligence, could reasonably have been discovered at that time.

The Court rejects Throckmorton's contentions. The evidence clearly supports the fact that the Williamses did not know of Throckmorton's involvement until their attorney received Popeye's/Martinsburg corporate records in October, 1991. It is also clear that the Williamses were not put on notice that any fraudulent activity had taken place until the summer of 1990 when "Ron's Sports Bar" came into existence. Since Throckmorton was added as a defendant in February, 1992, the action was filed well within the two year limitation period.

(d)  *Count IV — Breach of Fiduciary Duty*

As counsel for Mrs. Williams suggested in final argument, a director owes a fiduciary duty to a corporation and a corporation's shareholders. *Glass v. Glass*, 228 Va. 39, 47 (1984) (citing *Adelman v. Conotti Corp.*, 215 Va. 782, 790 (1975)). That fiduciary duty, however, runs only to the shareholders as a group and not to individual shareholders. *See, Am. General Ins. Co. v. Equitable General Corp.*, 493 F. Supp. 721, 741 (W.D. Va. 1980). As a consequence, Mrs. Williams' suit for breach of Throckmorton's fiduciary duty as a director of Popeye's/Martinsburg must also be dismissed.

Throckmorton also raised the statute of limitations as a defense to plaintiff's breach of fiduciary duty count. He contends that either the one year limitation period provided in Va. Code § 8.01–248 or the two year limitation period provided in Va. Code § 8.01–243(A) applies.

It is the opinion of the Court that the one year period of Va. Code § 8.01–248 governs this action. Under Virginia law, a suit alleging a breach of fiduciary duty by a corporate officer is a tort, not a contract

claim. *C-T of Va., Inc. v. Barrett,* 124 B.R. 689, 693 (W.D. Va. 1990). Under Va. Code § 8.01–248, every tort for which no limitation is otherwise prescribed must be brought within one year after the right to bring such action has accrued. Clearly, therefore this cause of action was also barred unless the discovery rule is applicable to it. That issue was not raised or argued. Since the Williams' breach of fiduciary duty count has been dismissed on other grounds, the Court need not decide that question.

For the reasons set forth above, the remaining counts of Mrs. Williams must be dismissed with prejudice. The defendants will be awarded their costs. Mr. Butler is requested to draft and circulate an order embracing (i) the court's rulings granting the defendants' motions to strike Counts I and V at the conclusion of Mrs. Williams' evidence, and (ii) the Court's dismissal of the remaining counts for the reasons contained in this letter opinion.